## JOHN H. GOLDEN *vs.* JACOB M. ELLIS et al.

### York.    Opinion May 11, 1908.

*Master and Servant.    Assumption of Risk.    Nonsuit.*

A servant assumes the risks of injuries from simple and ordinary appliances and methods, the nature of which he understands.

The duty of inspection, by an employer, of the appliances used by his employees, does not extend to the small and common tools in every-day use, of the fitness of which the employees using them may reasonably be supposed to be competent to judge.

If a servant continues in the services of his employer after he has knowledge of any unsuitable appliances, in connection with which he is required to labor, and it appears that he fully comprehends and appreciates the nature and extent of the danger to which he is thereby exposed, he will be deemed to have waived the performance of the employer's obligation to furnish suitable appliances, and to have voluntarily assumed all risks incident to the service under such circumstances. Such assumption of the risks of any employment by a servant will bar recovery independently of the principle of contributory negligence.

Although a hammer is made of suitable material and properly tempered, yet it is a matter of common knowledge that when it is used with great force upon other steel implements small chips or scales of steel are liable to break off and fly from one implement or the other.

When the evidence presented by a plaintiff with all the inferences which a jury would be justified in drawing from the same, is insufficient to support a verdict in his favor, so that it would be the duty of the court to set aside such a verdict, if rendered, the presiding Justice is not bound to submit the case to the jury but may properly order a nonsuit.

The plaintiff and a fellow servant were engaged in squaring up a certain stone from which a corner had been broken. The plaintiff was holding a bull-set, a steel implement, along one of the lines marked on the stone. His fellow servant then struck the bull-set with a steel striking hammer and a small piece of steel chipped off one corner of the face of the hammer and flew into the plaintiff's left eye, resulting eventually in the loss of both eyes. The plaintiff was employed by the defendants primarily as a blacksmith to sharpen tools and when not engaged in that capacity he was to work " elsewhere as an all-round " man. His experience as a tool sharpener comprised a period of fifteen years and he had learned from his experience that steel implements were rendered brittle by overheating and overhardening in the process of manufacture or sharpening and that in the use of

such tools, pieces of steel were liable to be broken off and fly from a hammer as well as from other tools. Prior to the accident he had noticed numerous fire cracks or checks on the face of the hammer used by his fellow servant and knew that it had been burned and was brittle and that it was liable to break and chip whenever used, but he never made any complaint in regard to the defective condition of the hammer and never made any request or suggestion that it should not be used in connection with any work that he was required to perform. He had never received from the defendants any request to continue in their service until another and suitable hammer should be supplied or any assurance that any other or different hammers would be used in connection with his work. He was not placed in a position where he was exposed by the nature of his duties to any undisclosed or unknown dangers. The precise condition of the defective hammer was not concealed from him nor the danger of using it unknown to him. *Held:* (1) That as the plaintiff fully understood and appreciated all the dangers to which he would ordinarily be exposed arising from the use of the overhardened hammer in connection with any branch of his work, he must be deemed to have voluntarily assumed the risks incident to his employment after full knowledge of the defective condition of the hammer used in connection with the service which he was required to perform. (2) That a nonsuit was properly ordered.

On exceptions by plaintiff. Overruled.

Action on the case to recover damages for personal injuries sustained by the plaintiff while in the employ of the defendants, and caused by the alleged negligence of the defendants, and which injuries resulted in the loss of both of the plaintiff's eyes. Plea, the general issue.

Tried at the May term, 1907, Supreme Judicial Court, York County. At the conclusion of the testimony offered by the plaintiff, the presiding Justice ordered a nonsuit and the plaintiff excepted.

The case appears in the opinion.

*Fred A. Hobbs,* and *Geo. F. & Leroy Haley,* for plaintiff.

*Verrill, Hale & Booth,* and *Cleaves, Waterhouse & °Emery,* for defendants.

SITTING: EMERY, C. J., WHITEHOUSE, STROUT, PEABODY, CORNISH, KING, JJ.

WHITEHOUSE, J.    This case comes to the Law Court on exceptions to the ruling of the presiding Justice ordering a nonsuit on the plaintiff's testimony.

In the fall of 1905, the defendants were engaged in building a stone bridge across the Mousam river at Kennebunk in pursuance of a contract with the Boston and Maine Railroad. The plaintiff was employed to work for the defendants primarily as a blacksmith to sharpen tools, and when not engaged in that capacity, he was to work "elsewhere as an all-round man." On the morning of October 2, among the "all round" duties imposed upon him, he was directed by the foreman to "square up" a certain stone from which a corner had been broken. After lining off the face of the stone with a "redwood and square," the plaintiff undertook to break off and cut the edges of a stone up to the lines marked upon it, by means of a bull-set and a large striking hammer. The bull-set is a steel implement five or six inches long. One end of it corresponding to the peen of a mason's hammer, is $\frac{3}{4}$ of an inch thick and suitably shaped and tempered for breaking stone. The other end, the head of the set, is left with the steel as manufactured without hardening. When duly equipped with a wooden handle, this bull-set bears a general resemblance to a hammer. The large striking hammer was a piece of steel with a head about two inches square, the corners being chamfered so as to give it an octagonal shape. The face of it was flat and showed the fine checks or fire cracks caused by overheating in the process of manufacture. There was only one other large striking hammer used on the job.

The plaintiff was holding the bull-set along one of the lines marked on the stone, and a fellow servant called for that purpose undertook to wield the striking hammer. A light blow was first struck on the head of the bull-set for the purpose of gauging the distance, and when the second blow was struck, a small piece of steel chipped off of one corner of the face of the hammer and flew into the plaintiff's left eye, resulting eventually in the loss of the sight of both eyes.

It is alleged that the striking hammer used on that occasion was defective and unsafe, and this action was brought by the plaintiff to recover damages for the injury suffered by him on account of the alleged failure of duty on the part of the defendants in not providing suitable tools to be used in connection with the service required of him.

The plaintiff was 46 years of age. He had worked as a stone mason for twenty-five years, and his experience as a tool sharpener comprised a period of fifteen years. He had learned from his experience as a blacksmith that steel implements were rendered brittle by overheating and overhardening in the process of manufacture or sharpening and that in the use of such tools, pieces of steel were liable to be broken off and fly from the hammer as well as from other tools. A week or ten days before the accident, he put a new handle into this defective hammer, and he states in his testimony that he noticed the fire cracks or checks on the face of it, and knew that it had been burned and was brittle, and that it was liable to break and chip whenever it was used. The plaintiff knew that the other striking hammer in use had a round face, while this one it has been seen had a square face, the corners being slightly chamfered. When the fellow servant came up to do the striking, the plaintiff admits that he neither inquired nor looked to see whether the hammer in his hands was the round faced one, or the square faced one with the fire cracks on it. He knew that it must be one or the other, but even when the striker gently laid it upon the head of the bull-set, held by the plaintiff, for the purpose of "getting the distance," the plaintiff did not look to see which one it was. He states in his testimony, it is true, that he supposed it was the good hammer, that the striker was using, but he gives no reason for this assumption. For aught that appears, it was as likely to be the defective hammer as the good one. He testifies that after that piece of steel had gone into his eye, at a time when he must have been suffering severe pain, he "noticed that it was the flat faced hammer with the cracks on it." But he admits, that he afterward said to some one at the hospital that he "couldn't tell until he saw it" whether the piece of steel that flew into his eye came from the hammer or the bull-set.

With respect to the defendant's knowledge of the defective condition of the hammer, the plaintiff testifies that on one occasion when the workmen "were all sitting around eating their dinner, somebody spoke about this hammer being in bad condition, the face of it being cracked, and the foreman said it was a new hammer

when they started the job." There is no evidence that the plaintiff himself ever gave the defendants or their representative in charge of the work, any information or made any complaint in regard to the defective condition of the hammer, or that he ever made any request or suggestion that it should not be used in connection with any work that he was required to perform. It does not appear that he ever received from them any request to continue in this service until another and a suitable hammer should be supplied in place of the one alleged to be defective, nor any assurance whatever that any other or different hammers would be used in connection with the service required of him. According to the testimony, the plaintiff himself appears to have had more precise and definite knowledge in regard to the alleged defects in the hammer in question than any representative of the defendants. He states that he could plainly see "somewhere in the neighborhood of a hundred" fire checks or cracks on the face of this hammer. He was a man of mature years and a workman of large experience both as a stone mason and as a blacksmith in sharpening tools. He knew that such fire cracks indicated overhardening and brittleness and that when a heavy blow is struck with such a hammer upon other steel implements, chips of steel are liable to fly from it. Even if a hammer is made of suitable material and properly tempered, it is a matter of common knowledge that when it is used with great force upon other steel implements, small chips or scales of steel are liable to break off and fly from one implement or the other. In *Hopkinson Bridge Co.* v. *Burnett,* 85 Texas, 16, cited in Thompson on Negligence, Vol. 4, sect. 4613, the "flying" or "chipping" of these scales or splinters of steel from hammers sufficiently hardened to be used in striking against steel, was held to be one of the ordinary risks incident to the employment.

But in considering the exceptions to the ordering of a nonsuit, full probative force must be given to all of the plaintiff's testimony. It is accordingly assumed that the plaintiff's grievous injury was caused by a small piece of steel which was splintered off from a defective hammer used in a proper manner by a fellow servant.

It has been seen that the plaintiff was not placed in a position where he was exposed by the nature of his duties to any undisclosed

or unknown dangers. The precise condition of the defective hammer was not concealed from him, nor the danger of using it unknown to him. The implement had been in his own hands within ten days prior to the accident, while he was fitting a new handle to it, and he admits that he then discovered those fire checks upon the face of it, which to his experienced eye were an infallible indication that the steel had been rendered brittle by overheating in the process of manufacture. The conclusion is therefore irresistible that he fully understood and appreciated all the dangers to which he would ordinarily be exposed arising from the use of an overhardened hammer in connection with any branch of his work. Under the circumstances of this case upon a well settled and familiar principle of law, he must therefore be deemed to have voluntarily assumed the risks incident to his employment after full knowledge of the defective condition of the implement used in connection with the service which he was required to perform.

This rule of law has been forcibly illustrated and fully considered in many of the recent decisions of this court. In *Conley* v. *Express Co.*, 87 Maine, 352, it is said in the opinion on page 356: "It is now settled law in this state that if a servant continues in the service of his employer after he has knowledge of any unsuitable appliances, in connection with which he is required to labor, and it appears that he fully comprehends and appreciates the nature and extent of the danger to which he is thereby exposed, he will be deemed to have waived the performance of the employer's obligation to furnish suitable appliances, and to have voluntarily assumed all risks incident to the service under these circumstances. Such an assumption of the risks of an employment by a servant will bar recovery independently of the principle of contributory negligence." See also *Cunningham* v. *Iron Works*, 92 Maine, 501; *Mundle* v. *Hill Mfg. Co.*, 86 Maine, 400; *Welch* v. *Bath Iron Works*, 98 Maine, 361.

In Thompson on Negligence, Vol. 4, sections 4707 and 4708, the author says: "It is a part of this doctrine that the servant assumes the risks of known defects in machinery, tools, appliances,

etc., or of improper appliances furnished for the performance of a particular task, or where no proper appliance is furnished, although the defect or danger results from the negligence of the master."

"A servant assumes the risks of injuries from simple and ordinary appliances and methods, the nature of which he understands, or which is easily understood. It is a part of this doctrine that the duty of inspection, by an employer, of the appliances used by his employees, does not extend to the small and common tools in every-day use, of the fitness of which the employees using them may reasonably be supposed to be competent judges."

It is accordingly the opinion of the court that the nonsuit was properly ordered. The evidence presented by the plaintiff with all the inferences which the jury could justifiably have drawn from it, was insufficient to support a verdict in his favor, so that it would have been the duty of the court to set aside such a verdict if it had been rendered. Under such circumstances, it is the established rule of procedure in this State that the court is not bound to submit the case to a jury, but may properly order a nonsuit. This rule of practice is too well settled to require the citation of authorities in support of it.

*Exceptions overruled.*