Argued January 19; reversed February 9, 1932

# FREEMAN *v.* WENTWORTH & IRWIN, Inc.

(7 P. (2d) 796)

[1]

*George Black, Jr.,* of Portland (Platt, Platt, Fales, Smith & Black, of Portland, on the brief), for appellant.

*Bert W. Henry,* of Portland, for respondent.

ROSSMAN, J. The defendant's plant, in which it conducted the business of selling and repairing motor trucks, occupied a two-story building 200 by 200 feet in dimensions. The plaintiff had been employed in the service department of that plant for six years as an expert in the repair of that portion of automobile trucks known as the transmission. Referring to this part of trucks he testified upon direct examination: "I was assigned as a specialist to do this particular kind of work," and added that during his six years' employment with the defendant he had repaired about 5,000 transmissions. November 15, 1929, the plaintiff, upon reaching the plant at 8 o'clock in the morning, was assigned to the task of discovering what, if anything, was wrong with the transmission of a disabled truck which had just entered the plant. He was told to hurry as much as possible because the owner wanted the return of his truck at 11 o'clock a. m. After disengaging the transmission from the chassis the plaintiff lifted the transmission from its place in the truck to

his bench by the use of a crane. He then disassembled the transmission and took the part which he suspected was in need of repair to a vat which contained a chemical compound which, when heated, removed grease from metal. However, the employee in charge of the vat had not yet heated the solution and, therefore, the plaintiff returned to his bench and cleaned the grease from the transmission to his satisfaction with a cloth and some hot water. The grease having been thus removed the plaintiff discovered some breaks in the cleaned part and called them to the attention of his foreman, one Charles Beck. A delay of half an hour ensued before Beck could communicate with the owner and acquaint him with the extent of the needed repairs. In this half hour's time the plaintiff removed further grease and inspected another part of the transmission. He then voluntarily abandoned work upon this job and did not return to it until 2:30 in the afternoon; the consent of the owner having been obtained in the meantime that the suggested repairs be made. At 3:30 p. m., after the plaintiff had completed the repair of the broken parts and was reassembling the transmission, he found it necessary to strike the end of the shaft with a hammer so as to adjust it into position. The shaft was made of hard steel. The plaintiff struck the blow, which he described as a tap, with a ball peen hammer made of steel and weighing half a pound or less. The hammer belonged to himself and had been provided in obedience to a custom which required all mechanics to supply their own hand tools. The first tap loosened a fine particle of steel from the shaft which flew into the plaintiff's right eye.

The complaint alleged that the defendant was negligent: (1) in having "failed to furnish for plaintiff's use a hammer made of soft material"; (2) in having

"failed to furnish light for plaintiff to work by''; (3) in having "failed to furnish any adequate cleaning device for the removal of grease and dirt from the used parts''; and (4) in having "failed to arrange for adequate time in which to do the work but required the plaintiff to hurry as much as possible so that the work would be finished and ready for delivery at the time fixed by the defendant.''

■ The first assignment of error challenges the ruling of the circuit court which denied the defendant's motion for a directed verdict. We shall now consider this exception.

While the plaintiff testified that he was told "to hurry it and get it out by 11 o'clock'' it will be observed from the testimony reviewed above that the plan to complete the job by 11 o'clock was abandoned when the foreman of the service department was unable to obtain the owner's consent to proceed with the repairs before half past 2 in the afternoon. Plaintiff's injury did not occur until 3:30 p. m. The above quoted words constitute practically the sole basis of the plaintiff's contention that he was told to hurry. When work was again resumed no instructions to hurry were given. So much time elapsed from the dissembling of the transmission until 2:30 in the afternoon, when work upon the truck was resumed, that the plaintiff upon his own volition abandoned work upon this job and proceeded with other work. We conclude that this specification of negligence is unsupported by proof.

■ The charge that the defendant "failed to furnish any adequate cleaning device for the removal of grease'' we believe is likewise unsupported by proof. The plaintiff did not testify that the vat with its con-

tents of grease-removing chemicals was any more effective as a grease-remover than the method which he employed upon discovery that the solution was cold, but testified that it was capable of accomplishing its result quicker. The defendant was not required to provide any specific kind of a grease-removing method. Its duty to exercise due care for the safety of its employees was discharged when it had provided a reasonably suitable appliance, material or method: *Blust v. Pacific Telephone Company,* 48 Or. 34 (84 P. 847). But even if we should grant that the defendant owed to the plaintiff a duty of providing a vat with a hot solution capable of removing the grease from the transmission, yet the plaintiff did not testify that in the afternoon when he proceeded with his work the solution was cold and incapable of removing the grease. It is true that he had testified that the contents were cold in the morning and that the employee in charge of the vat had told him he "could not do any washing for me that morning" but the plaintiff made no mention of the condition of the vat in the afternoon. Further, it will be observed from the testimony reviewed above that ample time had been available to the plaintiff to remove the grease from the transmission before he resumed work on this truck at 2:30 in the afternoon. A complete removal of the grease apparently was unnecessary. The use of the cloth with which the plaintiff wiped away the oil was so effective that after the accident he was able to discover a minute defect in the steel by rubbing the spot once more with his piece of cloth. We conclude that this charge of negligence could avail the plaintiff nothing.

We come now to the specification of negligence which alleges that the defendant "failed to furnish sufficient light for plaintiff to work by." The plaintiff

testified that the day of his injury was foggy. The service room in which he was employed was 90 by 200 feet in size. Both of its ends consisted largely of glass. Natural light was admitted to the central part of this room by a large light well. The plaintiff testified that light which ordinarily would have reached his work bench from the light well was partially obstructed that day. He testified that artificial light was available from series of electric lights. We quote from his testimony thus: "There is a series of lights of six lights running parallel north and south. I think there is different sets of these lights, a series running from the east to the west end." He then testified to the number of lights which were burning on the day of the accident thus: "There is several series of lights through the entire length of the building and at the time of the accident there was just a few these series on, I don't know how many." He added that he had the privilege of turning on lights by the use of a switch whenever he wanted more illumination. According to his testimony, a drop light over his bench had been out of repair for several months and an electric cord which would have enabled him to bring light from a distant connection had been in the repair department for more than a month, due to its defective condition. The plaintiff did not testify that he was unable to adequately observe the work in which he was engaged. Quite to the contrary, referring to the shaft previously mentioned, he testified:

"After I had got it wiped on the rear there, I found that it was cracked in about five or six places, I forget, it was over five or six places, so I wiped it up a little bit better. I didn't have any gasoline to do so, then I called ———— after I got it up so it was plainly visible, the broken part, I called the foreman   *   *   *."

He testified that after the spark had flown into his eye and he had stepped aside from his bench for a moment:

"I got back to my bench and looked at the end of the shaft to see the condition of the end of the shaft I had struck.

"Q. What did you find?

"A. I found it had been previously broken, chipped off.

\* \* \* \* \*

"A. The end of that shaft is about ⅞ of an inch in diameter \* \* \* and I wiped the end off, the grease, and I discovered there that the—that at the time I struck there I didn't see it had been previously broken at that point.

"Q. Could you see whether or not the steel there was partially broken?

"A. No sir. I could see the partially broken steel that had come off and also see the old break."

■ The plaintiff did not testify that the light which reached him was insufficient, nor that the absence of more light caused him to strike a point which he did not intend to hit. It will be observed from his testimony that other series of lights could have been illuminated by a mere turning of the switch. He nowhere testified that he misdirected his blow, failed to see the spot which he struck, or failed to discover the condition of the point at which he aimed the blow. He did not claim that the absence of more light rendered obscure anything which he desired to see. He was entitled to no more light than was reasonably necessary to permit him to conduct with safety the work in which he was engaged. If the required amount of light was supplied by the defendant, it was not guilty of this charge of negligence. Moreover, if more light would not have induced the plaintiff to refrain from tapping the shaft, the relationship of cause and effect did not exist

between this specification of negligence and his injury. It will be observed from the testimony previously quoted that a few moments after the spark had entered the plaintiff's eye he wiped the end of the shaft once more with a cloth, and then clearly observed the condition—an old break—which had caused the light tap of his hammer to shatter the steel. It seems evident that it was not the absence of light, but the plaintiff's failure to properly clean the end of the shaft which caused the accident.

We come now to the fourth specification of negligence which charges that the defendant "failed to furnish for plaintiff's use a hammer made of soft material but required him to use a steel ball peen hammer which was so hard that it was liable to and did cause small pieces of steel to chip off and fly." The answer alleged "it was the duty of the plaintiff to furnish his own hand tools * * * and if the plaintiff did not have any tools which were needed in the work he was doing it was his own fault." The reply admitted. "it was the duty of the plaintiff to furnish a kit of ordinary hand tools" but qualified this admission by adding "it was the duty of the defendant to furnish all special tools." The plaintiff and some of his witnesses testified that a soft hammer made of copper, brass or babbit metal was not an ordinary hand tool but constituted a special tool. These witnesses testified that when hard steel is struck with a hammer made of soft metal no sparks are emitted. They added that employers of mechanics customarily keep such hammers or short strips of copper or brass in their tool rooms where the mechanics can obtain them upon request. The plaintiff swore that during his six years' employment by the defendant it had never furnished him with a hammer made of copper although, accord-

ing to his testimony, he had asked it to do so. Proceeding, he added: "There is only a certain time you have to use any amount of force, and it is the practice among mechanics and machinists when there is anything like that has to be done, is to get a piece of copper or piece of brass, but we didn't have any copper or brass over there, so in order to safeguard on that sort of bludgeon work, as we call it, we usually got a piece of oak, hard word." He testified that the body-building department of the defendant's plant supplied him with pieces of hard wood upon request, but he did not account for his failure to use a piece of hard wood at the time of the accident. He testified that in adjusting the shaft into position it was necessary to hold one hand at the left end of the shaft while the tool in the right hand tapped the shaft upon its right end. If one held a hammer in his right hand and the end of the shaft with the other, it is not difficult to understand that no hand would be free to hold a block of hard wood between the end of the shaft and the hammer so as to soften the effect of the blow. But we cannot understand why the piece of oak could not be employed as the hammer or "bludgeon", to use plaintiff's own word. Only a light tap was needed. According to the witnesses, a copper hammer, weighing about a pound, would have sufficed. The hammer which the plaintiff used weighed only half a pound, and he drew it back no more than 12 inches before he struck the blow. The object to be struck was the end of a shaft 18 inches long and 1⅜ inches in diameter. Apparently hard wood of all shapes and sizes was available to the plaintiff. One of his witnesses spoke of a wooden mallet as a tool suitable for an operation of this character. It is altogether possible that the plaintiff by using the word "bludgeon" in the above answer meant that the oak block would be used

as the striking implement. The use of a block of wood, when the mechanic does not want to injure the surface he is about to strike, is certainly no novelty. We have all used blocks similarly.

■ As we have said before, the duty to use due care for its employees' safety did not require the defendant to supply the latest and most improved tools, but only such as were reasonably safe and of a kind generally used for that purpose. We know of no reason whatever why a short steel bar could not have been tapped into position by the use of a piece of oak; especially, do we know of no reason why this could not have been done by a workman who customarily used that method.

■ But if we assume that the duty to provide the employees with reasonably safe tools could be satisfied with nothing but a copper hammer, and that such a tool was not an ordinary hand tool but was a special one, we are satisfied that the plaintiff assumed the risk which resulted from its absence in defendant's shop. As previously stated, the plaintiff admitted that he had been in the defendant's employ for six years, had been constantly employed upon transmissions, was a specialist upon this specific kind of work, and that he had repaired about 5,000 transmissions. He testified that on Christmas eve of 1923 he sustained a similar injury to the same eye when a piece of hard steel was struck causing a spark to fly. As compensation for that injury the plaintiff acknowledged that the defendant had paid him $1,000, and he also acknowledged that it had given him an additional sum to defray the cost of removing the eye if that should be necessary. He freely admitted that he had gone to an eye specialist in the employ of the defendant many times during his employment with the defendant to have particles removed from his eye. He likewise admitted

that it was nothing unusual to have "chips" fly from objects which were being struck. We quote from his testimony thus:

"Q. In other words, these little foreign particles on that kind of work, they are just liable, anything you hit, there is always a possibility of a little chip flying off, is there not?

"A. Some material, yes.

"Q. In other words, it is one of the ordinary things that happen in that kind of work from time to time?

"A. Yes."

The plaintiff, by reason of his contract of employment is presumed to have agreed to assume all the risks ordinarily and obviously incident to the discharge of his duties. Risks which arose from his employer's negligence; that is, risks which were avoidable by the exercise of reasonable care upon the defendant's part, he is not presumed to have agreed to assume: *Adams v. Corvallis & E. R. Co.*, 78 Or. 117 (152 P. 504). But if an employee has actual knowledge of the increased danger to which his employer's negligence has subjected him, or if the defect is so patent and obvious that in the exercise of ordinary care he should have known of them, he is regarded as having assumed them too. We quote from *Westman v. Wind River Lumber Co.*, 50 Or. 137 (91 P. 478):

"If he agrees and consents to work at a place which will expose him to danger, knowing and fully comprehending such danger and the risk he incurs thereby, he cannot complain, if he is injured, that the place might have been made safer by the fending or guarding of the machinery. But this is on the theory that he knowingly and voluntarily assumed the increased risk, and not because it was not the duty of the master to protect the machinery in the first instance. If, as said by Mr. Justice LORD, in Roth v. North Pac. Lum. Co., 18 Or. 211 (22 P. 844), 'the service required to be performed is

dangerous, or rendered so by reason of the master's failure to provide a place where the servant may do his work with safety, but which, by the exercise of due care and reasonable expense on the part of the master, might have been made safe, his omission would be a breach of duty, and render him liable for any injury arising therefrom, unless the servant has knowledge of, and comprehends the nature or extent of, the risks to which he is exposed at the place provided, and thereby dispenses with the performance of this duty on the part of the master, or unless the master, when the servant is ignorant or inexperienced, points out, or gives him full notice of, the risks attending such service at the place to be performed, and thereby enables him to appreciate such risks and to avoid them.' "

See to same effect *Wintermute v. Oregon-Wash. R. & N. Co.,* 98 Or. 431 (194 P. 420). The rule in other jurisdictions is generally to like effect. The cases are collected in 39 C. J., Master and Servant, p. 735, § 936.

It is apparent that the plaintiff had full knowledge of and appreciated the danger to himself which arose out of the defendant's alleged failure to keep in its tool room a copper hammer. Those two elements, as was said by Mr. Justice Burnett in *Wintermute v. Oregon-Wash. R. & N. Co.,* supra, "are the ingredients of assumption of risk." Moreover, he neither asked for nor possessed an assurance that the defect would be remedied. We believe that it is obvious that the plaintiff assumed the risk resulting from the defendant's alleged default. In the carefully reasoned decisions announced in *Golden v. Ellis,* 104 Me. 177 (71 Atl. 649), and *McDonald v. Standard Oil Co.,* 69 N. J. Law, 445 (55 Atl. 289), conclusions to like effect as our own were reached upon facts similar to those before us.

The above testimony and the foregoing principles of law induce the conclusion that the plaintiff

failed to establish a cause of action against the defendant based upon common law negligence. But the question remains whether the evidence shows that the defendant neglected the duty exacted by that part of section 49-1701, Oregon Code 1930, which provides:

"All owners, contractors, or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity.for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

The only employments protected by this clause are those which are of the general kind mentioned specifically in preceding parts of the act; that is, those which men commonly regard as dangerous and hazardous: *Bottig v Polsky,* 101 Or. 530 (201 P. 188). The evidence showed that in the service department where the plaintiff was employed two power-driven machines were maintained, one of which he used frequently. The transmission parts of automobiles are very heavy, weighing approximately 300 pounds. He was required in the course of their repair to remove them from the chassis of automobiles to his bench and then, having completed the repair, to reinstall the transmission into the chassis. In performing his work he used a crane, various tools and was surrounded by other workmen and by trucks. We have already pointed out that in his work particles of steel and of other substances were frequently projected into his eye. The above being the circumstances, we believe that the plaintiff was entitled to have submitted to the jury the question whether he was engaged in an employment which

subjected him to risks and danger and, if so, whether it would have been made safer by maintaining in the tool room a soft metal hammer, provided he was not required to furnish such a tool himself.

This court has held many times that an employee does not assume the increased risk which results from his employer's failure to provide the safety devices required by the Employers' Liability Act. The authorities are collected in *Poole v. Tilford,* 99 Or. 585 (195 P. 1114), and in *Sonniksen v. Hood River Gas & Electric Co.,* 76 Or. 25 (146 P. 980). See also *Ramaswamy v. Hammond Lumber Co.,* 78 Or. 407 (152 P. 223). In *Dorn v. Clarke-Woodward Drug Co.,* 65 Or. 516 (133 P. 351), it was held that this defense was not maintainable, even where the action was based upon a violation of the above general clause of the act. It follows from the foregoing that we are of the opinion that the plaintiff's proof submitted for the jury's consideration four questions: (1) Was the work in which the plaintiff was engaged one that involved a risk and the danger to the employees of the defendant, including himself? (2) Was a soft metal hammer an ordinary hand tool or a special tool? (3) If it was the latter, would the presence of such a tool in the tool room have made the work in which the plaintiff was engaged safer? (4) Was the failure of the defendant to supply such a tool the proximate cause of the plaintiff's injury? Such being our conclusion, it follows that the motion for a directed verdict was properly denied.

■ The next assignment of error presents the problem whether the document presented to the circuit judge by the foreman of the jury as its verdict was really an integration of the minds of the jurors to such an extent that it, in fact, constituted a verdict. Counsel

for the parties had stipulated that if the jury reached a verdict after the circuit court judge had left the courthouse, the "jury might disperse and go to their homes that evening and the verdict be brought into court and returned upon the opening of court on the following day." At 11 p. m. of the last day of the trial, being an hour after the judge had left the courthouse, the jury dispersed, after the foreman had attached his signature to the following: "We, the jury in the above entitled case, find our verdict in favor of plaintiff and against the defendant, and fix plaintiff's damage at $6,000." The next morning, when all of the jurors were in their seats in the jury box, the foreman handed this writing to the judge. Thereupon the attorney for the defendant (appellant) moved that the jury be individually polled. In reply to the clerk's question: "Is this your verdict?" eight of the jurors replied "yes," three replied "no" and one answered that she had been in favor of a verdict for the plaintiff but not in the sum of $6,000. Further questioning took place but the above results were not altered. When these circumstances developed, counsel for the defendant moved that the jury be discharged and the case reset for trial. The court, being in doubt, dismissed the jury, accepted the verdict, denied the motion, and later entered judgment in favor of the plaintiff, based upon the belief that the aforementioned document, in fact, constituted a verdict for the plaintiff.

In civil cases three-fourths of the jury may render a verdict: Oregon Constitution, article 7, section 18.

Section 2-310, Oregon Code 1930, provides:

"After hearing the charge, the jury may either decide in the jury box or retire for deliberation. If they retire, they must be kept together in a room provided

for them, or some other convenient place, under the charge of one or more officers, until they agree upon their verdict or are discharged by the court.''

Section 2-317 provides:

''When the jury have agreed upon their verdict, they shall be conducted into court by the officer having them in charge.''

Section 2-318 provides:

''If the jury appear, they shall be asked by the court or the clerk whether they have agreed upon their verdict; and if the foreman answer in the affirmative, he shall, on being required, declare the same.''

Section 2-319 provides:

''When a verdict is given, and before it is filed, the jury may be polled on the request of either party, for which purpose each shall be asked whether it be his verdict; if any juror answer in the negative, the jury shall be sent out for further deliberation. If the verdict be informal or insufficient, it may be corrected by the jury under the advice of the court, or the jury may be again sent out.''

Section 2-320 provides:

''When the verdict is given, and is such as the court may receive, and if no juror disagree, or the jury be not again sent out, the clerk shall file the verdict. The verdict is then complete, and the jury shall be discharged from the case. The verdict shall be in writing, * * *.''

It thus appears that the parties had agreed that the jury could disperse if it did not agree upon a verdict until after the judge had left the courthouse for the night; that, in fact, no verdict was reached until after the judge had gone home; that the statutes of this state require the jury to be ''kept together in a room * * * under the charge of one or more officers until they agree''; that, upon agreeing, the jury

shall be conducted into the court room; that the jury upon presenting their verdict may be polled; that they may be sent out for further deliberation and the verdict may be corrected by the jury under the advice of the judge; that, although this alleged verdict is signed by the foreman, it developed upon the polling that it represented the conclusion of only eight of the jurors; and that the judge accepted the verdict.

Problems similar to the one before us have been before many other courts. The decisions of those courts suggest three possible solutions: (1) the consent to a sealed verdict waives the right to poll the jury; (2) the stipulation for a sealed verdict does not waive the right to poll the jury, but waives the right to insist that the jury be kept together until its verdict is read in court; and (3) there exists no right to demand that the jury be polled; whether the jury should be polled is a matter resting within the discretion of the trial judge.

*Hancock v. Winans,* 20 Tex. 320, is a decision which suggests that one who stipulates for a sealed verdict thereby waives the right to insist that the jury be polled. We quote from that decision the following as a fair statement of the reasons upon which decisions to that effect are based:

"But where the parties have consented that the jury might return their verdict sealed to the clerk, we think they must be deemed impliedly to have consented that the verdict so returned, if in truth agreed to by all the jurors at the time, should be received without further question, or the reservation to the jury of the right to change it after having dispersed with their consent, and heard the out-of-doors opinions of the parties and their friends. Such a practice would manifestly lead to abuses; and the consequence would be that there would be no safety in permitting

or consenting to such verdicts, and though a very convenient practice, it would become too dangerous to be tolerated. Indeed, it would be better not to allow the practice at all, than to permit it with the reservation of the right claimed in this case.   *   *   *   And we conclude that by consenting to the return of the verdict in this manner and the separation of the jury, the parties must be held to have waived the right to have the jury polled, unless it be for the purpose of ascertaining whether they were all agreed to it when it was returned.''

A case typical of the kind falling within the second group is *Sanders v. Charleston Consol. Ry. & Lighting Co.*, 154 S. C. 220 (151 S. E. 438). The court there said:

''If the juror had agreed to the verdict the night before unconditionally, and not upon a mistaken conception of his duty, as appears to have actuated the juror in this case, he could have changed his mind overnight and when the verdict was published registered his dissent. His assent must appear at that time or the verdict is void. There would be absolutely nothing to be accomplished by polling the jury if the dissent of a juror to the verdict when it was published is not to be regarded; his previous assent is in all instances presumed.''

A decision taken from the third group is *Whitner v. Hamlin*, 12 Fla. 18:

''The question presented by the record is not as to the right of parties to poll the jury in all cases, but whether after the jury has delivered a sealed verdict by the consent of parties, either party may demand as a right that the jury shall be polled. We are of the opinion that no such right exists, and that such applications must be addressed to the sound discretion of the judge, whose duty it is to see that no wrong or injustice is done to parties, and whose discretion in such cases is not a matter for review by this court.''

The latter group of cases is of no assistance in the solution of our problem because we believe that our statute does not make the polling of the jury discretionary with the judge but, in harmony with the general rule (Abbott's Civil Jury Trials (4th Ed.), p. 839, and 27 R. C. L., Verdict, p. 839, § 8), grants this privilege as an absolute right. It will also be observed that in *Hancock v. Winans,* supra, the court did not deny the right to question the jurors upon the polling as to whether they had acquiesced in the verdict when the foreman signed the same, but refused only to permit an inquiry as to whether their minds still concurred in it. In our present case the three jurors who answered "no" when polled had never subscribed to the verdict and the fourth, who was in favor of the plaintiff but believed that $6,000 damages should not be awarded, did not want herself to be understood as having changed her opinion during the course of the night, but asserted that she had never been in favor of the award.

The respondent, however, in addition to relying upon *Hancock v. Winans,* calls to our attention the following excerpt taken from Abbott's Civil Jury Trials (4th Ed.), p. 939:

"The right to poll the jury may be lost by waiver, such as a failure to exercise it when the verdict is returned in open court or until the jury has been discharged and separated. And it has been held that the consent to a sealed verdict waives the right to poll the jury."

In support of the latter statement the text cites *Koon v. Phoenix Mut. Ins. Co.,* 104 U. S. 106 (26 L. Ed. 670); *Whitner v. Hamlin,* 12 Fla. 18; and *Miller v. Mabon,* 6 Iowa 456. We have already reviewed *Whitner v. Hamlin* and have shown that in Florida where

no statute has been enacted upon the subject the courts have held that the polling of the jury is a discretionary privilege. In *Koon v. Phoenix Mut. L. Ins. Co.* the parties stipulated that "the jury might, when they had agreed upon their verdict, if the court should not then be in session, sign and seal the same, and deliver the same to the officer in charge and disperse." The jury reached its verdict when the court was out of session, sealed the verdict in an envelope and handed the same to the officer in charge of them. The next morning after the envelope had been handed to the judge of the court, in the absence of the jury, it was opened and received as the verdict of the jury. The appellant then demanded that the jury be polled. The court held that the above stipulation "was equivalent to an agreement by both parties, on the retirement of the jury, that the court might, when the sealed verdict was handed in by the officer, open it in the absence of the jury and reduce it to proper form, if necessary. The stipulation was also a waiver of the right to poll the jury if they should not be in court." The judgment of the lower court was affirmed. In *Miller v. Mabon,* being the third of the cases cited by Abbott, the parties had stipulated that the jury might seal their verdict and hand it to the clerk. We now quote from the decision:

"The code provides that, when by consent, the jury have been permitted to seal their verdict, and separate before it is rendered, such sealing is equivalent to a rendition and recording thereof in open court; and that 'the jury shall not be polled, nor shall they be permitted to disagree thereto, unless such a course has been agreed upon between the parties'."

The court held that since the parties, when they agreed that the verdict might be sealed, had not also

agreed that the jury might be polled no right to poll was saved. It will be observed that the cases cited by Abbott do not support his statement. Respondent also cites *Harrison v. The State,* 100 Ga. 264 (28 S. E. 38). In that case the facts were: the parties had stipulated for a sealed verdict; no request for a polling was made until after sentence had been pronounced, the jury had been discharged and had gone to the clerk's office to receive their warrants; the court held that the request came too late. The conclusion of the court that the request was tardy obviously was well taken.

We deem it unnecessary to comment extensively upon the remaining cases cited in respondent's brief. In *Reed v. Rideout's Ambulance, Inc.,* 212 Ala. 428 (102 So. 906), the court held that the defeated party could not demand the polling of the jury when the court directed the verdict. In *Drda v. Schmidt,* 47 Ill. App. 267, the court sustained the trial court's order which denied a polling of the jury when it appeared that a rule of court provided that a stipulation for a sealed verdict should be deemed a waiver of the right to poll the jury.

It will thus be observed that none of the authorities cited by the respondent would justify this court in disregarding the answers made by the jury upon the poll. Quite to the contrary, much authority can be found, in addition to that already noted, holding that under the circumstances before us the alleged verdict must be disregarded. We quote from Hyatt on Trials, § 746 (the writer is referring to sealed verdict and to the jury):

"In civil cases and in misdemeanors such verdicts are regarded as permissible in all cases, in the discretion of the court; but they were required in all cases to come into open court and confirm it by an oral verdict."

From Hyatt on Trials, § 750, we quote:

"The presence of the jury on the presentation of their verdict is essential, if for no other reason than that the parties may exercise their right to a poll of the jury. As stated in a previous section the practice of allowing the jury to seal up their verdict and temporarily disperse is practically universal in America, but the rule allowing this practice does not relieve the jury from the necessity of being in personal attendance on the court when the verdict is opened and read. In civil cases, the parties may stipulate that the jury may return their verdict to the clerk's desk under certain conditions, but this is not a waiver of the right to have the jury present when the verdict is opened."

In addition to the many cases cited by Abbott in support of the statements just quoted, we call attention to the several decisions cited in the annotation to *Bino v. Veenhuizen,* 141 Wash. 18 (250 P. 450, 49 A. L. R. 1297, 1302). In the recent case of *Sanders v. Charleston Consol. Ry. & Lighting Co.,* 154 S. C. 220 (151 S. E. 438), the question was considered at great length. The majority opinion held that the right to poll the jury was not waived by a stipulation for a sealed verdict. In *Spielter v. North German Lloyd S. S. Co.,* 232 App. Div. 104 (249 N. Y. S. 358, 364), the court held that upon the receipt of a sealed verdict any juror who the night before had acquiesced therein might now change his mind and ask to be relieved from the concurrence which he had previously expressed.

After having given the matter considerable thought, we have come to the conclusion that the stipulation of the parties did not waive the right of either to demand a polling of the jury, and was nothing more than a waiver of the right granted by the above mentioned section of our laws to insist that the jury be kept together until their verdict had been announced

in court. It is true that occasionally some juror of the doubting Thomas type may consult a volunteer during the course of the night, after having signed his signature to the sealed verdict, and then change his mind; and it is also true that to permit a juror to withdraw his concurrence after the jurors have dispersed may afford opportunity to a dishonest juror. But these instances are rare. On the other hand, it must occasionally happen that a juror is induced by a mistaken understanding of the contents of the written verdict to acquiesce therein; others who are improperly overcome by the majority need the protection which the polling affords; otherwise there would be no statutes permitting the polling of the jury.

In expressing the above conclusions it must be borne in mind that this is not a case where the jurors, upon the polling, announced that they had changed their minds, but is an instance where they had never acquiesced in the verdict which the foreman contends represented the verdict of the jury.

The above being our conclusions, it follows that the judgment of the circuit court must be reversed. The case will be remanded with instructions to proceed in harmony with the above views.

RAND and KELLY, JJ., concur.

BEAN, C. J., concurs in the reversal of the judgment for the reason the verdict is invalid.