## SMITH v. SHEVLIN–HIXON CO.
### No. 11030.

Circuit Court of Appeals, Ninth Circuit.
July 31, 1946.

John F. Conway, Harry H. George, Jr., and Emerson U. Sims, all of Portland, Or., for appellant.

Veazie & Veazie and J. C. Veazie, all of Portland, Or., for appellee.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

Asserting that her right knee was injured when she jumped from a table top to the floor in the course of her work in the appellee's box factory, the appellant brought suit for $7,400 in the court below. From a judgment ordering that the appellee's motion for a directed verdict be sustained, the present appeal was taken.

In pre-trial proceedings the following facts were stipulated:

The appellee, a Delaware corporation, operates a box factory at Bend, Oregon, where it employed the appellant between October 26, 1942, and August 24, 1943. Many power-driven machines are used in the factory.

On May 15, 1943, and for some time prior thereto, the appellant had been directed to do "punking" work—that is, grading, sorting, and stacking behind a "hi-cut-off" saw. Her place of employment was a space approximately three feet square, enclosed on three sides by tables, the tops of which were about thirty-three inches from the floor. The fourth side consisted of moving rolls, which the appellant contends were power-driven and the appellee maintains were operated solely by gravity. The rolls were of about the same height from the floor as the tables.

The "hi-cut-off" saw was located approximately two feet above the tables, on the end opposite the rolls. Here the sawyer took lumber from a bin behind him and sawed it into short lengths, which he slid down to the table where the appellant was working. The appellant then sorted the cut lumber and after stacking it, placed it on the rolls, which carried it away. She was required to work near power-driven machinery daily.

On May 15, 1943, the appellant, at the direction of Guy Smith, foreman, was taken to the Lumbermen's Hospital, at Bend, with an injured knee.

Among the issues submitted to the trial court for determination were the following:

The appellant contended that the only means of entrance into her place of employment was to come down a cat-walk, crawl over a rail to the table, and then jump from it to the floor or crawl over the rolls. The appellee maintained that she could have walked to her station on the floor level or entered either under or over the rolls, or could have descended safely without jumping.

The appellant asserted that a ladder, stairway, or a redesigning of the operational set-up could have been used without impairing the efficiency of the structure, and that thus there would have been provided a safe means of entrance, without requiring her to jump down thirty-three to thirty-six inches. The appellee denied this, insisted that there was a safe means of entry which she could have used, but admitted that on or about April 17, 1944, the rolls were removed from the rear of the enclosure in which the appellant had been required to work, and a moving belt placed under the front table, leaving open the rear of the enclosure.

The appellant alleged that on May 15, 1943, when she jumped from the table top to the floor to begin work behind the No. 4 cut-off saw, she suffered a fractured bone and semilunar cartilage and "other damage thereto", of her right knee, together with torn and wrenched ligaments of the said knee. The appellee denied that the appellant jumped, and contended that she was not injured at all on May 15, 1943, and that if she did jump, it was her own negligence.

The appellant asserted that because she was employed in a box factory "or sawmill," was required to be near and about power-driven machinery, and for other reasons, the work that she performed was one involving risk and danger to the employees and to the public, and particularly to herself, within the meaning of the Employers' Liability Act of Oregon, 7 Oregon Compiled Laws Annotated, Sec. 102-1601, et seq., the pertinent provisions of which are copied in the margin.[1] The appellee denied that any risk or danger referred to in, or within the interpretation of, that statute caused, or in any way contributed to, the alleged injuries.

█ It is hornbook law that, on a motion for directed verdict, the evidence adduced by the opposing party shall be taken

---

[1] "102-1601. * * * and generally, all owners, contractors or sub-contractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

* * * * * * *

"102-1606. Contributory negligence. The contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damage."

as true and all reasonable inferences deducible therefrom shall be given their most favorable intendment. This rule is recognized in the jurisprudence of Oregon.

In Holland v. Hartwig, 145 Or. 6, 10, 24 P.2d 1023, 1024, the court said:

"The question may be further simplified by bearing in mind that in determining whether the cause should have been submitted to the jury, direct evidence of any fact or facts should be construed as proof thereof. Where any fact, even though disputed, is disclosed by direct evidence, such fact may support an inference, because, with respect to disputed testimony in solving the question here involved, it is not for the appellate court to determine what the truth is. This court has but to ascertain whether there is direct testimony which the jury could have construed as proving the fact in question."

Again, in Christie v. Great Northern R. Co., 142 Or. 321, 328, 329, 20 P.2d 377, 380, the point was further elaborated:

"Upon a motion for a directed verdict in favor of defendant, every reasonable inference that may be drawn from the testimony is to be resolved in favor of plaintiff. * * *"

The supreme court of the state has repeatedly declared that the Employers' Liability Act of Oregon is a remedial and preventive statute, and should be liberally construed. A full exposition of the commonwealth's public policy relating to enterprises that require work involving risk or danger to the employees or the public, is to be found in Camenzind v. Freeland Furniture Co., 89 Or. 158, 179-181, 174 P. 139, 146:

"It must at all times be kept in mind that the Employers' Liability Act is both remedial and preventive in character. To the extent that the statute abolishes the defenses of common employment, contributory negligence, and assumption of risk, it is purely remedial; and, to the extent that it imposes upon the master the duty of taking active steps to lessen the possibility of injury or death to the employé, it involves the additional element of prevention; and it may also be observed that, as stated in Browning v. Smiley-Lampert Lumber Co., 68 Or. 502, 512, 137 P. 777, our statute seems to be broader in its scope than kindred statutes found in other states. The outstanding purpose of the statute is to protect employés from injury, and the statute should be liberally construed to effect that purpose. [Many authorities cited].

"The duty imposed upon the master by the Employers' Liability Act is a nondelegable duty [cases cited]; it is also a continuing duty [authorities cited]; and therefore, when we once determine the duty imposed upon the master, we find a duty which is absolute, nondelegable and continuing; the employer cannot absolve himself from the performance of it, nor can he delegate it to the employé, but it adheres to him without the possibility of suspension or interruption. Moreover, a transgression of the statute is negligence per se and is actionable. [Many cases cited]."

In the above-described benign legal climate, then, is the case made out by the appellant to be tested. Briefly summarized, her evidence is as follows:

Three or four days before the accident the appellant's right knee "bothered" her "just a few times." She spoke to her foreman, Guy Smith, who "was supposed to be the first-aid man there," and had "broken her in on the job," about her trouble with her knee. She asked him whether he could either put her on another job or arrange some means whereby she could get into her work position more easily. "He just laughed at me and he said, 'Oh, that is just old age coming on you.'"

The foreman told her to get in by jumping in. In her testimony on cross-examination, the appellant related the conversation in detail:

"Well, the way it happened, when I first went onto the work, when I first went onto this cutoff, Guy Smith, the foreman, was going to show me how to punk in that place. * * * Well, he was down in this pit. He told me to come on over and he went ahead of me and he was down in this pit when I climbed up the catwalk and came down these stairs. I was standing by him and I said, 'Gee, how do I get into

that place?' in that pit, or something on that order, and he said—just looked up and kind of smiled and said, 'Yump'. * * *

"Q. And so you 'yumped'? A. Yes."

In a deposition read at the trial, the foreman Smith denied that he had told the appellant to jump.

Five of the appellant's fellow-workers testified that either they themselves or the girls engaged in punking operations generally would jump into the "pit." One of these, in addition to the appellant herself, said that jumping was the only way to get into the "pit."

At the time of the accident, the appellant had been on this particular job of "off-bearing" for about two weeks. She hurried with her work just as the other girls did, and tried to do as they did, as nearly as she could. She also did what her foreman told her.

The "drawing," "gnawing," or "pulling" feeling in her right knee that she noticed a few days before the accident was caused by the constant jarring resulting from her continual jumping into the "pit." The X-ray findings indicated that the jump which she made on the night of May 15, 1943, caused the injuries that form the basis of this suit. The appellant testified, "Well, when I jumped that night I definitely hurt that knee."

The appellant worked near power-driven rolls.

The learned judge below conceded that the Employers' Liability Law of Oregon is "rigid," "very strict, very severe," and that "A very high standard of care is imposed on an employer." He was impressed, however, with the theory that "the problem was one of causation". In developing that theory, the court below indulged in a series of "assumptions" that, if established in fact, would sustain the appellant's position, provided a causal connection was shown between the appellee's fault and the accident:

"Now here, assuming, as we must for the purpose of this argument, that it was necessary for the employee, in order to get to her work, to get down from a table about the height of the table where counsel are seated there, assuming for these purposes that there was a violation of the statute, and assuming that that was not the safest kind of an access to her work that could have been provided, the question still remains, was the providing of that kind of an access, although not the safest, was that the proximate cause of her injury?"

Perhaps a simpler statement of the problem would be that we are here confronted with two propositions, both of which would have to be resolved in the affirmative if the appellant is to prevail:

1. Was there sufficient evidence to go to the jury tending to show that the appellee had failed in its statutory duty to "use every device, care and precaution which it [was] practicable to use for the protection and safety of life and limb"?

2. If so, was there sufficient evidence to go to the jury on the question of whether or not such failure was a proximate cause of the accident?

We will discuss the two propositions seriatim.

1. The opinion in the case of Hamilton v. Redeman, 163 Or. 324, 334–338, 97 P.2d 194, 199, contains so exhaustive and comprehensive a review of the Oregon jurisprudence relating to the employer's duty in a situation of this kind that we quote from it in extenso:

"In Roth v. Northern Pacific Lumbering Co., 18 Or. 205, 22 P. 842, 844, Mr. Justice Lord, in announcing this court's decision, said:

" '* * * But, on the other hand, if the servant is ignorant *or inexperienced,* and does not know or understand the risks incident to his employment, and to which he would be exposed, and an injury happens to him without any negligence on his part, and without the master warning or pointing out the dangers, he would be guilty of a breach of duty, and liable to the servant for the injury he sustained.

*        *        *        *        *        *

" 'So that in a case like the present, where the evidence is conflicting as to whether or not the defendant [sic] *had knowledge of the risks to which he was exposed, the question is pre-eminently for the jury.'* * * *

"In Christie v. Great Northern Railway Co., 142 Or. 321, 20 P.2d 377, and in Galvin v. Brown & McCabe, 53 Or. 598, 101 P. 671, the principles just mentioned were applied with the result that although the workman may have been aware of his employer's negligent omission of duty, he was not chargeable with the assumption of the resulting risk of injury.

"In Millen v. Pacific Bridge Co., 51 Or. 538, 95 P. 196, 198, the defendant, which was engaged in construction of a sewer, had completed two sections which approached each other within 17 feet.

\* \* \* \* \* \*

"The decision \* \* \* pointed out that Larsen [plaintiff's intestate] was *inexperienced* and, according to the testimony, 'handled a shovel like a greenhorn.' It declared that, although he must have seen that the trench's wall was 25 feet high, and that no protection had been made to prevent its falling, 'there is a difference between knowledge of the surrounding circumstances and appreciation of a risk. \* \* \* Can it be said, as a matter of law, that the circumstances related in this record show conclusively that the extraordinary risk and danger of this bank caving was so obvious to an ordinarily intelligent person that it would be perceived and appreciated at once? Mr. Chief Justice Moore, in Johnston v. Oregon S. L. & U. N. Ry. Co., 23 Or. 94, 95–105, 31 P. 283, 286, has defined such a risk as follows: "An open, visible risk is such a one as would in an instant appeal to the senses of an intelligent person. Wood, Mas. & Ser. 763. It is so patent that it would be instantly recognized by a person *familiar with the business*. It is a risk about which there can be no difference of opinion in the minds of intelligent persons *accustomed to the service*." \* \* \* It was not a danger so patent that it would be involuntarily recognized by one *inexperienced and unfamiliar with the business.*'

"This decision quoted the following from Illinois Steel Co. v. Schymanowski, 162 Ill. 447–459, 44 N.E. 876:

" 'Even if the servant has some knowledge of the attendant danger, his right of recovery will not be defeated, if, in obeying the order, he acts with the degree of prudence which an ordinarily prudent man would exercise under the circumstances. When the master orders the servant to perform his work, *the latter has a right to assume that the former, with his superior knowledge of the facts, would not expose him to unnecessary perils.* The servant has a right to rest upon the assurance that there is no danger which is implied by such an order. The master and servant are not altogether upon a footing of equality. The primary duty of the latter is obedience, and he cannot be charged with negligence in obeying an order of the master unless he acts recklessly in so obeying. *Whether he acted thus recklessly in obeying his master's order, or whether he acted as a reasonably prudent person should act, are questions of fact to be determined by the jury.'*

"The judgment for the plaintiff was affirmed." [Emphasis supplied.]

In the Schymanowski case, quoted in Hamilton v. Redeman, supra, the supreme court of Illinois used language peculiarly pertinent here [162 Ill. 447, 44 N.E. 878]:

" \* \* \* A foreman in charge of workmen, and clothed with the power of superintendence, is bound to take proper precautions for the safety of the men at work under him. \* \* \* The jury might well have believed that, if he [the foreman] had exercised proper skill and foresight, the accident would not have happened. Whether or not appellee [the workman] was in the exercise of ordinary care was a question of fact for the jury. \* \* \*"

The duty of a workman to obey the order of a foreman, even though that order be negligent, and the question of the jury's function when the giving of that order is disputed, are well discussed in Peluck v. Pacific Machine & Blacksmith Co., 134 Or. 171, 174, 175, 293 P. 417, 419:

"Christofferson, the foreman, was, by virtue of the act, the agent of the defendant, and plaintiff would not be precluded from recovery by conforming to any order of the foreman, even though such order were negligent. As stated in Yovovich v. Falls City Lumber Co., 76 Or. 585, 149 P. 941, 944:

" 'Under section 5 of the act, when the decedent conformed to the orders of his superior according to his duty, the resulting injury was not his fault.'

"Plaintiff's action is predicated upon the alleged negligence of the foreman in directing him to throw emery dust into the gears while the machine was in operation. Defendant practically concedes that such an act would constitute negligence, but denies that such order was given. An examination of the record discloses that there is evidence tending to establish the theories of both parties. It was, therefore, plainly a question of fact for the jury to decide. * * * "

The fact that no one else had been injured by jumping into the so-called pit, of course, does not excuse the employer from liability for the accident that did occur. In Quinn v. Hawley Pulp & Paper Co., 85 Or. 630, 635, 167 P. 571, 572, the court said:

"That the bales were stacked up in the usual way does not controvert the showing of the plaintiff. If that was the habitual method of storing the paper, the wonder is that some one was not hurt before the injury in question. If the process used was such as in fact to cause hurt to the employé, when it was practicable to obviate the danger, its long continuance does not make it less culpable."

Had it been given the opportunity to do so, the jury might well have found that it would have been "practicable" to give the appellant easy access to her place of work by removing the rolls from the rear of the enclosure. As we have seen, this actually was done on or about April 17, 1944, with the result that the rear of the enclosure was left open.

The appellant also contends that a ladder, a stairway, or a redesigning of the operational set-up could have been used without impairing the efficiency of the structure, and that this would have permitted a safe means of ingress. Here again the jury, after examining the voluminous exhibits and hearing the testimony, should have had the opportunity of passing upon this factual question.

Nor can the appellee excuse itself by urging that it could not have foreseen that the appellant would suffer the particular mishap that overtook her. In Mc-Millen v. Rogers, 175 Or. 453, 154 P.2d 219, 222, decided in December, 1944, the supreme cuort of Oregon quoted with approval the following language:

" ' * * * In order to render a party liable for the consequences of his wrongful act, it is not necessary that he should have contemplated or been able to foresee the precise form or manner in which the plaintiff's injuries would be received.' Aune v. Oregon Trunk Railway, 151 Or. 622, 632, 51 P.2d 663, 667.

" 'Liability for negligence is not predicated upon the necessity that the wrongdoer should foresee that an injury would result from his wrongdoing. It is sufficient that *in view of all the circumstances,* he should have foreseen that his negligence would probably result in injury of some kind to some one.' Horne v. Southern Railway Co., 186 S.C. 525, 197 S.E. 31, 36, 116 A.L.R. 745.

" ' * * * It is not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear *to the ordinarily prudent eye.* * * * ' Shearman and Redfield on Negligence, Revised Edition, volume one, pages 55 to 58, inclusive." (Emphasis supplied.)

The evaluation of "all the circumstances" and the application of the criterion of what would be "clear to the ordinarily prudent eye" are, under the Anglo-American system of law, peculiarly within the province of the jury. It is in the jurybox rather than in an appellate court that the law prefers such practical and everyday tests to be made.

The facts in the case of Liptak v. Kurrie, 244 Pa. 117, 90 A. 442, 443, are nearly parallel with those of the instant case, and the law there expounded is in complete harmony with the principles recognized by the supreme court of Oregon:

"It is apparent that the defendants failed in their duty to the plaintiff and other

employés engaged in the same service in furnishing proper means of access to and descent from the platform. * * * *The employés made use of the iron bars to make the ascent to and descend [sic] from the platform because there were no other means furnished for the purpose.*

"* * * *It was their duty to furnish reasonably safe means for the boy to reach the platform and to make his descent from it, * * *.*" (Emphasis supplied.)

See also Galvin v. Brown & McCabe, 53 Or. 598, 610, 101 P. 671; Wolsiffer v. Bechill, 76 Or. 516, 526, 146 P. 513, 149 P. 533; Adams v. Corvallis & E. R. Co., 78 Or. 117, 131, 152 P. 504; Suey v. Benson Hotel Co., 91 Or. 395, 402, 179 P. 239; Fitzgerald v. Oregon-Washington R. & N. Co., 141 Or. 1, 12, 13, 16 P.2d 27.

Applying the foregoing principles to the evidence adduced by the appellant for the purpose of establishing the appellee's failure to meet the standards of "care and precaution" laid down by the act, we believe that there was sufficient evidence to go to the jury on the following points:

■ (a) That the appellee failed to "use every device" that it might have been "practicable to use" for the safety of its employees engaged in "punking" work. The jury might reasonably have reached the conclusion that the rolls should have been removed sooner, or that stairs or a ladder could have been installed, or other appropriate changes made.

We are aware that the appellee suggests various other ways in which descent to the "pit" could have been effected, besides jumping—such as sliding off the table on one's stomach or from a sitting position. It is also true that the learned trial judge characterized the appellant's method as "her own way of getting down off of the table."

As we have seen, however, there was evidence to the effect that these ungraceful methods were not used by the workers, at least two of whom testified that jumping was "the only way" to get down. We are therefore compelled to the conclusion that both the lower court and, in its brief here, the appellee assumed the functions of a jury, and weighed the evidence.

■ (b) That the appellee failed to use "every * * * care and precaution" for its employees' safety, as required by the statute. It will be remembered that the appellant testified that, when her knee "bothered" her three or four days before the accident, she spoke to her foreman, Smith, about it, and asked him whether he could assign her to some other work or arrange some means whereby she could get into the pit more easily. He "just laughed" at her, and twitted her about the onset of "old age," according to her testimony. The appellant also said on the witness stand that when she first went on this particular job, she asked her foreman how she could get down into the pit, and he told her to "yump."

Now, by his own testimony, Smith had "broken in" the appellant on the job. In view of this fact and in view of the further facts that he was her superior officer and, according to her testimony, "was supposed to be the first-aid man there," the jury might well have found that the appellant had a right to rely upon his instruction that she jump when it was necessary for her to get down to the floor level of her work station.

At this point it might be well to advert to the fact that the learned judge below did not "take seriously that the plaintiff was 'instructed,' 'directed,' to jump by her foreman." Similarly, the appellee argues in its brief that "this so-called order was nothing more than a rather amused personal suggestion by Guy Smith, the amusement being prompted, undoubtedly, by the idea that a woman of mature years and accustomed, by her own account, to rather strenuous physical activity, should ask how to descend from a low table."

Here again it is to be observed that both the court below and the appellee arrogated to themselves the function of the jury by *interpreting* the testimony, instead of confining themselves to the sole question of whether there was *sufficient* testimony to go to the jury.

There are two answers to the appellee's contention that the foreman's "suggestion" that the appellant jump should not be taken seriously.

First, the argument usurps not only the function of the jury, but of the appellee's own witness. Smith had the opportunity to testify that in making the "suggestion" he was indulging in levity. On the contrary, however, he flatly denied having made the statement at all. Which version are we to accept—the appellee's or that of its witness?

We realize, of course, that the appellee was driven to the necessity of offering this explanation of Smith's testimony by the state of the case. This was the dilemma: If the appellee admitted that Smith did make the "suggestion" and offered no explanation for it, the appellee's case would be materially weakened. If, on the other hand, the appellee pointed out that Smith had denied making the statement, it would be admitting that there was a material conflict in the testimony, which only a jury could resolve.

As to appellee's comment that the table was "low," we can say only that its admitted height of thirty-three inches resembled Mercutio's mortal wound:

"No, 'tis not so deep as a well, nor so wide as a church-door; but 'tis enough, 'twill serve."

If we take the appellee's hypothesis at its fact value and assume that the foreman was in fact merely joking with the appellant when he told her to "yump," we find the appellee in another difficulty. When an inexperienced worker goes to her immediate "boss" for instructions as to how to carry on her work safely, she is entitled to expect a serious and well-considered reply. If her foreman gives her a twitting or jocular answer, he is guilty of negligence of the clearest sort.

It might have seemed funny to Guy Smith that the appellant, who, according to her testimony, had been "bothered" with her knee because of the jumping-on-the-job that she had been doing, should come to him for a less strenuous assignment. It might have seemed droll to this foreman that this "woman of mature years" should want some means of descent by which she could be spared that thirty-three-inch jump. It might be highly humorous that she should inquire of him, when starting out on her new job, "Gee, how do I get into that place?" But the jury might well have found —if the learned judge below had given it the opportunity to do so—that Guy Smith's sense of humor was ill-timed and ill-advised, and therefore constituted negligence on his part as a foreman, for which negligence his company would have to pay. "Where a corporation authorizes one of its employés to have control over a particular class of workmen in any branch of its business, such employé is, quoad hoc, the direct representative of the company." Illinois Steel Co. v. Schymanowski, supra, 44 N.E. at page 878.

2. If the foregoing postulate dealing with the employer's negligence is established as a demonstrated proposition, it is not difficult to resolve the second question; namely, If the employer was negligent, was there sufficient evidence to go to the jury as to whether such negligence was a proximate cause of the accident? Indeed, we shall find that much of the evidence tending to prove the first proposition will be useful in sustaining the second.

Just as precise foresight of the particular injury is not necessary to render one liable for the consequences of his wrongful act—a doctrine approved in McMillen v. Rogers, supra, 175 Or. 453, 154 P. 2d 219—so is such precise foresight unnecessary "in order to constitute a particular act the proximate cause of the injury." Miami Quarry Co. v. Seaborg Packing Co., 103 Or. 362, 371, 204 P. 492, 495. It is sufficient if the wrongdoer could have reasonably anticipated that some injury might result.

The learned judge below recognized that "it is usually said that the question of causation is a jury question". He failed to make it clear, however, why the instant case was an exception to the rule.

The supreme court of Oregon has been emphatic in declaring that causation is a matter for the jury to determine. Ludwig v. Zidell, 167 Or. 488, 496–500, 118 P.2d 1073, 1077, decided in November, 1941, and apparently overlooked by counsel, is extremely apposite here not only for its comprehensive exposition of this rule, but also for the fact that it pertinently distinguishes

on the facts one of the very cases relied upon by the appellee in the instant case:

"Whether the installation of such protective guard or housing could have been made without impairing the efficiency of the machine is a question of fact.

"Involved collaterally in considering the question of the practicability of proposed methods of guarding the machine is the question whether the failure to have installed such or any covering or guard *was the proximate cause of plaintiff's injury. That too is a question of fact.*

\* \* \* \* \*

"We are unable to follow defendants in this to the extent of holding that, as a matter of law, defendants' failure to install protective covering or guards about the machine in suit was not the proximate cause of plaintiff's injury.

"*We think the question should have been submitted to the jury.*

\* \* \* \* \*

"In a case not controlled by the provisions of the Employers' Liability Act, but only by the principles of the common law, this court has said:

"'By "proximate cause" is not meant the last act of cause or nearest act to the injury, but such act, wanting in ordinary care, as actually aided in producing the injury as a direct and existing cause. It need not be the sole cause, but it must be a concurring cause such as might reasonably have been contemplated as involving the result under the attending circumstances.' Brown v. Oregon-Washington R. & N. Co., 63 Or. 396, 403, 128 P. 38, 40.

\* \* \* \* \*

"In a case under the Employers' Liability Act wherein plaintiff's decedent, while entering upon an elevator, sustained injuries resulting in his death, the duty, corresponding to that which rested upon the defendants herein, is stated with his customary clarity by Mr. Justice Rand thus:

"'Was there a device, not used by defendant, which it was practicable to use for the protection of defendant's employees and which if used would not have limited the efficiency of defendant's elevator, and if used would have protected the decedent from the injuries which caused his death?' Fromme v. Lang & Co., 131 Or. 501, 505, 281 P. 120, 122.

"It is true that in cases of this character the matter of properly presenting to a jury the question whether defendants' alleged misconduct was the proximate cause of plaintiff's injury has been involved in extensive judicial discussion. The language of the Supreme Court of the United States in an early case, however, is clear and cogent:

"'\* \* \* a careless person is liable for all the natural and probable consequences of his misconduct. If the misconduct is of a character which, according to the usual experience of mankind, *is calculated to invite or induce the intervention of some subsequent cause,* the intervening cause will not excuse him, and the subsequent mischief will be held to be the result of the .original misconduct. This is upon the ground that one is held responsible for all the consequences of his act which are natural and probable, and ought to have been foreseen by a reasonably prudent man.' Atchison, T. & S. F. R. Co. v. Calhoun, 213 U.S. 1, 29 S.Ct. 321, 323, 53 L.Ed. 671.

"We think that, when plaintiff rested his case in chief, this question should have been treated as a question of fact in order that opportunity might be afforded defendants to present their testimony thereupon; but an order of involuntary nonsuit should not have been entered. Hill v. Saugested, 53 Or. 178, 98 P. 524, 22 L.R.A.,N.S., 634.

"In Vanderflute v. Portland R. L. & P. Co., 103 Or. 398, 404, 205 P. 551, 553, cited by defendants [and relied upon by the appellee herein], \* \* \* this court said:

"'There is no testimony that plaintiff was compelled to go into the street in the way of traffic or to expose himself to the danger of collision with vehicles while he performed his work. The very work in which he was engaged was subordinate to the right of vehicles to use the street.'

"In the case at bar, it is shown that plaintiff was *required* to enter the shear house in order to oil the machine and that *customarily* the clutch by which the motor

was put in gear was operated from inside of the shear house.

\* \* \* \* . \*

*"In the case at bar, the plaintiff was at a place furnished by defendants in the performance of his duty to his employers* when he observed the metal piece, which in his opinion might cause serious damage to the machine in its contacts with the moving parts or injury to his own person by breaking and flying out and striking him." (Emphasis supplied.)

See also Palmer v. Portland Ry., L. & P. Co., 56 Or. 262, 268-269, 108 P. 211, quoting extensively, in connection with the question of proximate cause, from the opinion of Mr. Justice Lamar in Grand Trunk R. Co. v. Ives, 144 U.S. 408, 417, 12 S.Ct. 679, 36 L.Ed. 485, in which the jury's function in negligence cases is discussed; Hartford Fire Ins. Co. v. Central R. R., 74 Or. 144, 148-150, 144 P. 417; Voshall v. Northern Pac. Terminal Co., 116 Or. 237, 244, 240 P. 891; Gillilan v. Portland Crematorium Ass'n, 120 Or. 286, 294, 295, 249 P. 627; Freeman v. Wentworth & Irwin, Inc., 139 Or. 1, 15, 7 P.2d 796; Watson on Damages for Personal Injuries, section 65, at pages 69, 70.

In the instant case, the jury might reasonably have found that the proximate cause of the accident to the appellant was the appellee's negligence in either of the following respects:

(a) Because the appellant was required to work in a place to which the only ingress was by means of a thirty-three inch jump; or

(b) Because the foreman instructed the appellant to jump.

It is true that the foreman denied both that jumping in was the only way of entering the "pit" and that he had advised her to use that method:

"No, I never instructed her; as a matter of judgment she had two or three different ways of getting in.

"Q. Had you ever told her the way to ·get in was to step in and jump to the floor? A. No."

These very denials, however, point up in sharper relief the jury's indispensable function in this case—that of resolving conflicts in the evidence.

Indeed, counsel for the appellee, during a colloquy in the court below, conceded that "there is a conflict on lots of points."

In its brief the appellee, somewhat naively, we think, points out that neither pleadings nor evidence charge that there was any defect either in the table from which the appellant jumped or in the floor on which she landed. It seems obvious that the defect charged is the lack of proper means of descent into the "pit", and not the physical structure of the table or the floor. It was the *jump* that was injurious.

The court below seemed impressed with the theory "that plaintiff's own actions, her own way of getting down off the table, broke the chain of causation, as it is sometimes said, and became the immediate and proximate cause of the accident." The view that jumping was the appellant's "own way" of getting down runs counter to the evidence adduced on her behalf, which, as we have seen, is that jumping was the usual, and even the sole, way of descending to the floor level of the appellant's work station.

Furthermore, if the appellee's failure to furnish a safe means of descent caused the appellant to have to jump, such failure, and not the appellant's "own actions," caused the accident. The jury might well have found that the appellee's negligence forced the appellant to jump; that her jump caused the accident; and that therefore the appellee was responsible for her injuries. The cause of the cause is the cause of the effect.

The cases relied upon by the appellee are distinguishable on the facts. One of these, Vanderflute v. Portland Railway, Light & Power Co., supra, 103 Or. 398, 205 P. 551, already has been noticed. We need advert to only two others, both heavily stressed by counsel.

In Staples v. Senders, 164 Or. 244, 253, 96 P.2d 215, 219, 101 P.2d 232, construction of the Employers' Liability Law was not involved. Furthermore, the following excerpt from the opinion demonstrates that there was no causal link between the alleged negligence and the accident:

"The plaintiff was proceeding sidewise examining the clocks on the wall, when he fell into the opening at the entrance to the stairs. No railing was required at this point, and the absence of railings on the other three sides of the opening obviously had nothing whatever to do with the accident."

The court's further discussion of the facts, on pages 254-255 of the opinion in 164 Or., on page 219 of 96 P.2d, likewise shows that the chain of causation had not been established.

In Ferretti v. Southern Pacific Co., 154 Or. 97, 101, 105, 57 P.2d 1280, 1282, the plaintiff's previous injury was not only admitted by him, but was insisted upon as being part of his case, for in his complaint he alleged:

" '(a) That although plaintiff's right arm was in a weakened condition, as defendants well knew, and the latter were instructed to place plaintiff at light work, the defendants carelessly and negligently placed plaintiff at work which was beyond his capacity,' " etc.

In the instant case the appellant denied that she had ever told any one, long before the accident, that she had a "trick knee", or that she had ever told any one that she had been suffering from knee or leg trouble prior to the beginning of May, 1943.

To put the matter beyond cavil, however, the following paragraph from the Ferretti opinion at once removes that case as authority for the case at bar:

"At this juncture it is well to bear in mind that we have not before us a case involving defective machinery or appliances, negligent manner or method of operation [case cited]; *or failure to provide a reasonably safe place in which to work* [case cited]. *Neither does it involve accidental injury.*" (Emphasis supplied.)

Accordingly, we are of the opinion that there was sufficient evidence to go to the jury both on the question of the appellee's negligence and on the issue of whether or not such negligence, if any, was the proximate cause of the accident.

The judgment ordering that the appellee's motion for a directed verdict be allowed is reversed, and the case is remanded for further proceedings not inconsistent with this opinion.