**SHEVLIN–HIXON CO. v. SMITH.**

**No. 11567.**

Circuit Court of Appeals, Ninth Circuit.

Dec. 29, 1947.

[4] 270 U.S. 416, 46 S.Ct. 318, 320, 70 L.Ed. 654.

[5] 1 Cir., 27 F.2d 4.

172

Veazie, Powers & Veazie, of Portland, Ore., for appellant.

John F. Conway, Harry H. George, Jr., and Emerson U. Sims, all of Portland, Ore., for appellee.

Before GARRECHT, DENMAN, and HEALY, Circuit Judges.

GARRECHT, Circuit Judge.

This is the second time that this case has been brought before this court on appeal. In the first appeal, the present appellee sought review of a judgment ordering that the present appellant's motion for a directed verdict be sustained. We reversed the judgment of the lower court, and remanded the case for further proceedings. Smith v. Shevlin-Hixon Co., 9 Cir., 157 F.2d 51. For convenience and brevity, we will hereinafter refer to this earlier opinion as "the first case".

The appellee asked for damages in the sum of $7,400, for injuries to her right knee suffered when she jumped from a table top to the floor while she was employed in the appellant's box factory. The jury awarded her $5,900.

The appellant moved for judgment notwithstanding the verdict. The judgment below denied the appellant's motion, and awarded the appellee damages in accordance with the verdict of the jury, together with $541.62 as costs. From that judgment the present appeal has been taken.

In pre-trial proceedings, the following matters were admitted as to the issues framed by the complaint and the answer thereto:

The action was brought under the Employers' Liability Act of Oregon, § 102-1601, O.C.L.A.1940, which requires, among other things, that "all owners, contractors or subcontractors and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices."

The appellant is a Delaware corporation and the appellee is a citizen of Oregon. The appellant operates, among other things, a box factory where many power-driven machines are used, at Bend, Oregon, where it employed the appellee between October 26, 1942, and August 24, 1943. The box factory is an integral part of a large lumber manufacturing plant in which much power-driven machinery is used.

On May 15, 1943, and for some time prior thereto, the appellee had been directed and assigned to do 'punking' work—that is, grading, sorting and stacking, behind a hi-cut-off saw. Her place of employment was a space approximately 3 feet square bounded on three sides by tables, the tops of which were approximately 33 inches from the floor. The fourth side consisted of rolls of approximately the same height from the floor.

In the same room there were eight hi-cut-off saws, a number of ripsaws and resaws, all power-driven, and, in addition thereto, there were moving rolls. The appellee was required to work and did work within arm's length of the rolls and the hi-cut-off saws, and was required to pass by and work near the other operating power-driven machinery daily during the course of her employment.

The hi-cut-off saw was located approximately 2 feet above the tables surrounding the appellee and opposite the rolls. Here the sawyer took lumber from a bin or stall behind him and sawed it into short lengths, which he slid down to the table where the appellee was working. The appellee then sorted the cut lumber and, after stacking it, placed it upon the rolls, which carried it away.

An overhead cat-walk with descending stairs allowed the sawyers to get to their machines. As soon as the sawyer finished all the lumber in one bin, he, together with

his 'punk' or 'grader', moved to the next machine.

Four sawyers were working at the same time on the night of the accident. The night foreman was Guy Smith.

On May 15, 1943, the appellee, at Smith's direction, was taken to a hospital, with an injured knee.

Among the issues framed by the pretrial were the following:

The appellee contends that the rolls were live rolls. The appellant contends that they were operated solely by gravity.

The appellee asserts that the tables that she had to go over were 36 inches from the floor, while the appellant says that they were only 33 inches high.

The appellee maintains that she lost no work, prior to May 15, 1943, because of any complaint connected with her knee, and had not lost more than two days since she started working for the company. The appellant denies this.

The appellee contends that the only means of entrance into her place of employment was to come down the cat-walk, crawl over a rail to the table, and then jump from it to the floor, or crawl over the rolls. The appellant insists that she could have walked to her place of employment on the floor level, or entered either under or over the rolls, or could have descended safely without jumping.

The appellee asserts that a ladder, a stairway, or a redesigning of the operational set-up could have been used without impairing the efficiency of the structure, machine, or other apparatus or device, and without regard to the additional cost of suitable material or safety appliances and devices, which would have permitted a safe means of entering the appellee's place of employment, and would not have required her to jump down 33 or 36 inches. The appellant denies this and maintains that there was a safe means of entry that she could have used. The appellant admits, however, that on or about April 17, 1944, the rolls were removed from the rear of the enclosure in which the appellee had been required to work, and that a moving belt was placed under the front table, which left open the rear of the enclosure.

The appellee alleges that on May 15, 1943, when she jumped from the table top to the floor to begin work, she suffered a fractured bone and semilunar cartilage and other damage thereto, the exact nature and extent of which is unknown to her, of her right knee, together with torn and wrenched ligaments of the knee. The appellant denies that she jumped, and contends that she was not injured at all on that date, that she had no fractured semilunar cartilage or wrenched knee, or other injury thereto that was sustained by her in its box factory, and that, if she did jump, it was by her own negligence.

The appellee avers that because she was employed in a box factory or sawmill, that because she was required to work and did work close enough to touch the moving rolls and dangerous hi-cut-off blades, and that by reason of being, during the course of her daily employment, required to be near the various other power-driven ripsaws, and resaws, the work that she was required to perform was one involving risk and danger to the employees and to the public generally, and particularly to herself, within the meaning of the Oregon Employers' Liability Act, supra. She further asserts that by reason of the means of ingress and egress to her place of employment, that because during her working hours she was subjected to the dangers thereof, and that because of the nature of her employment generally, her cause of action comes within the ambit of that act.

This contention, which is perhaps the crucial point in this second appeal, is denied by the appellant, which further denies that any risk or danger referred to or within the interpretation of that act caused or in any way contributed to any injury suffered by the appellee.

From the foregoing statement of facts and of issues, it will be seen that the two principal questions here presented are the following:

1. Does the Employers' Liability Act of Oregon apply at all to the appellee's cause of action?

2. If so, did the appellee make out a case of employer negligence sufficient to

174

go to the jury, so as to be entitled to relief under the act?

These two propositions form the basis of the appellant's Specifications of Error Nos. 1, 2 and 4.

■ 1. The answer to the first question turns on the subsidiary questions of whether or not the appellee's employment, in general, and the specific operation in which she was engaged at the time of the accident, in particular, were inherently dangerous.

■ As the appellant points out, at the time the first case was decided by this court, the "impression held rather extensively by Bench and Bar" was "that where the general occupation of an injured employee is one involving risk and danger, * * * an injury sustained while he is performing an act which is not inherently dangerous would be subject to the act." Because of the fact that appellee was required to work within arm's length of the rolls and hi-cutoff saws and for the other reasons set forth in the foregoing statement of admitted facts, it was not seriously questioned in the first case, nor is it seriously questioned in the present appeal, that the appellee's general occupation involved danger. In any event, we then assumed and we now rule that such was the case.

The appellant, however, now earnestly contends that such a holding is not sufficient to bring the appellee's cause of action within the purview of the act. Under a recent decision of the Supreme Court of Oregon, according to the appellant, it is not enough that an employee's "general work may involve risk and danger; but, on the contrary, although his general work involves risk and danger, if such an employee sustains an injury while performing an act which is not inherently dangerous, he is not entitled to the benefits of the Employers' Liability Act."

The recent decision relied upon by the appellant is that of Barker v. Portland Traction Co., Or., 173 P.2d 288, 291, on rehearing, Or., 178 P.2d 706, both opinions having been handed down by the Oregon Supreme Court subsequently to our decision in the first case.

It therefore now becomes necessary for us to examine the facts and the full impli-cations of the Barker case, and to determine whether it actually overrules the admittedly established earlier doctrine.

In that case, the plaintiff, the operator of a one-man street car as an employee of the defendant company, slipped and fell while removing packed snow from an automatic switch over which his car would have to pass. At the intersection where the switch was situated, the company maintained a telephone available to its operators, which afforded them direct connection with the dispatcher. On this point the court said:

"Had the plaintiff wished to use that telephone when he came upon the obstructed switch he could have done so. He testified that whether an operator, upon encountering a disabled switch, telephones to the dispatcher or attends to the matter himself is a question for his own decision."

The dispatchers see to it that a switchman or other employee takes care of a switch that is reported out of order.

Holding that removing snow from a small area of a public street is not "inherently dangerous", the state court, 173 P.2d at page 297 of its main opinion, supra, said:

"We do not believe that the plaintiff's contention [that he was covered by the act] is warranted by any language of the Employers' Liability Act. Certainly no express provision of the act extends its protective features to employees engaged in the performance of non-hazardous work. According to our interpretation of the act, its protection is available only to (1) employments which are attended with inherent risks and dangers, and (2) employments which are rendered hazardous through the use of machinery, scaffolding, dangerous substances, electrical devices or other equipment and substances which are expressly enumerated in the act."

In the Barker case, the plaintiff relied chiefly upon the decision of the Oregon Supreme Court in the case of Fitzgerald v. Oregon-Washington Railroad & Navigation Company, 141 Or. 1, 7, 8, 9, 16 P.2d 27, 30, from which he quoted the following excerpts:

"It is not necessary for an employee to be actively engaged in his work in order

to be within the protection of the statute. [Many cases cited]

\* \* \* \* \* \*

"To ascertain whether the statute applies to an employee in a given case, the character of service is determined by the contract of employment. \* \* \*

"The question is not necessarily what was the employee doing at the very moment he was injured, but what did the terms of his contract of employment contemplate he would do when so directed."

Neither in its main opinion in the Barker case nor in its opinion on rehearing, however, did the Supreme Court of Oregon disapprove of the foregoing language. On the contrary, after quoting other passages from the Fitzgerald decision, the court distinguished that case from the Barker case on the facts. In that connection, the court said, in its opinion on rehearing, supra, 178 P.2d at page 707:

"No part of the Fitzgerald decision says that an employe who sustained an injury while he was (1) not engaged in construction work; (2) not working around scaffolding, electricity, machinery, a floor opening or dangerous substances; or (3) not performing work which involved 'risk or danger,' may nevertheless recover under the act."

In the instant case, the appellee admittedly *was* working around power-driven machinery. In fact, such machinery was within arm's length from her.

We now reach the question, apparently made pertinent by the decision in the Barker case, supra, of whether or not, at the precise instant of the accident, the appellee was "performing work which involved 'risk or danger.'"

▮ Whether or not jumping into the pit was "inherently dangerous" for the appellee was a question for the jury. Yovovich v. Falls City Lumber Co., 76 Or. 585, 592, 149 P. 941; Bottig v. Polsky, 101 Or. 530, 549, 201 P. 188; Vanderflute v. Portland Railway, Light & Power Co., 103 Or. 398, 401, 402, 205 P. 551; Jodoin v. Luckenbach S.S. Co., 125 Or. 634, 641, 268 P. 51; Ferretti v. Southern Pacific Co., 154 Or. 97, 103, 57 P.2d 1280. We are here concerned solely with the question of whether or not there was sufficient evidence on that point to go to the jury.

Properly to evaluate the appellee's situation at the instant when she jumped into the "pit," we here must pause for a brief review of the evidence bearing upon that point. Since the appellant's very first specification of error avers "That there is no competent evidence to support a verdict in favor of plaintiff," for the purpose of this discussion the evidence adduced by the appellee must be taken as true.

At the time of the accident, the appellee was thirty-seven years old and weighed 165 pounds. When the accident occurred, she had been "on that particular job" for about two weeks. A person who did that type of work was known as a punk.

Before she entered into this "new job," she asked her "immediate foreman" how she "should get in there." "He said, 'Yump,' so I continued to 'Yump.'" Incidentally, her foreman also had "charge of safety in the mill," according to his own testimony, which was offered by the appellant.

Finding that jumping-on-the-job was causing "a drawing or gnawing sensation" in her leg, the appellee asked her foreman whether he couldn't put her into different work, or whether "he could fix some means by which" she "could get in there and out of there easier."

"He just laughed at me and said, 'Oh, that is just old age creeping up on you'."

▮ In this connection, it should be pointed out that, in ascertaining whether or not an employment, or any operation involved therein, is inherently dangerous, the *place* where the work is to be done, must be considered. In Vanderflute v. Portland Railway, Light & Power Co., supra, 103 Or. at page 401, 205 P. at page 552, the court said:

"In determining whether the work in question does in truth involve a risk or danger, we must give consideration to the place in which the work is to be done, as a factor influencing the decision."

See also Jodoin v. Luckenbach S.S. Co., supra, 125 Or. 634, at page 639, 268 P. 51.

The cutter with whom the appellee was working was "very fast." "So often, if

176

the cutter was in a hurry to cut that particular amount of work at night, he would have that saw going by the time I would hit the ground or the floor and turn around ready to grab a piece, or to grab boards that would already be coming down. I had to work fast to do that, very fast."

The Supreme Court of Oregon has held that the *speed* with which the work must be done is an element of the hazard. In Bottig v. Polsky, supra, 101 Or. at page 549, 201 P. at page 195, the following language was used:

"If, however, Bottig's version is correct, then it is a question of fact for the jury to decide whether the work was rendered inherently dangerous because of the insecure position of the offending barrel, together with other attending circumstances, such as the greasy condition of the barrels, poor light, and *the hurry required of the men.* In other words, it is for the jury to say whether because of the attending circumstances and conditions the work was rendered inherently dangerous. The defendant's contention [also made in the instant case] that the Employers' Liability Act is as a matter of law inapplicable cannot be sustained." [Emphasis supplied]

Cf. Jodoin v. Luckenbach S. S. Co., supra, 125 Or. 634, at pages 639-641, 268 P. 51.

On cross-examination, the appellee emphasized that jumping into the pit "was required," that it "was a part of the job." Some of the other girls testified that they jumped. "The only way you could get in" was by jumping. "It just comes natural to jump off. *You don't slide off.*"

Nevertheless, the appellant in its brief suggests that the appellee might have first sat upon the table and then might have slid into the pit, instead of jumping from a standing position from the table to the floor. When counsel for the appellant made the same suggestion to one of the appellee's witnesses, the punk's pungent reply was notable:

"Q. Could you slide off the table? A. If you wanted the seat of your pants torn off from bolts or something."

All the girls wore slacks on the job. One of them testified that the steel covering on the work bench was cold on a cold day, "I hope to tell you." From all the evidence on the subject, the jury was justified in inferring that sliding from the steel would have been not only uncomfortable, but injurious to skin as well as to clothing.

In the words of the Supreme Court—used in another connection—in determining whether there was evidence to support the jury's implied finding that jumping into the pit was "inherently dangerous" for the appellee, "the total situation, including the risk undertaken," should be considered. United States v. Silk, 331 U.S. 704, 719, 67 S.Ct. 1463, 1471. Let us then assess the appellee's "total situation", the high-pressure milieu in which she performed her nightly task.

It has been said that lawsuits are not to be decided in a vacuum. Certainly the appellee did not work in one! Surrounded by power-driven machinery that was only an arm's length away, and hard pressed by a "fast cutter" who started feeding out pieces of sawn wood down to her before she landed at the bottom of the pit, she stood not upon the order of her jumping, but jumped at once.

It is true that she could have gingerly picked a seat for herself on the wooden part of the table, since there is evidence that on one side it was not covered with steel. Thus she could have sat on the table without danger of tearing her clothing on the bolts or screws. And then, from a sitting posture, she could have slid into the pit, thus obviously lessening the impact of the descent.

But her foreman had instructed her to jump. When she had found that jumping was a strain on her, she had gone to him for help out of her quandary. She had asked for a different assignment, or for some means by which she could get into the pit more easily.

But he only laughed at her, and twitted her about the onset of old age. To any woman, this would have been galling repartee. It was particularly disconcerting to a middle-aged woman who realized that her job depended on alertness and agility and speed.

Other girls were jumping into the pit. So, unable to get relief from her immediate superior, the appellee jumped also. She had to keep up with the economic procession.

The jury might therefore well have believed her when, even under cross-examination by skillful counsel, she insisted that jumping was "required"—that it "was a part of the job."

And, so believing her, the jury could with equal reason have reached the conclusion, which, by its verdict, it seems to have done, that jumping-on-the-job was inherently dangerous. In any event, this court cannot say, under all the facts in this case, that such a finding, which would meet the requirement of the Barker case, was reversible error. To paraphrase the language of Mr. Justice Cardozo in Williams v. Mayor and City Council, 289 U.S. 36, 42, 53 S.Ct. 431, 433, 77 L.Ed. 1015, "Within the field where men of reason may reasonably differ," the jury "must have its way."

The appellant seeks to make much of the fact that the appellee testified she did not remember just how she "did go about jumping in there." Counsel adds, however, that "She was always careful to say that she 'jumped.'"

While it might be argued that the appellee's testimony might have been more satisfactory had she described with anatomical particularity the precise acrobatics whereby she negotiated the 36-inch descent, the jury apparently believed her when she testified that she did jump. As we have seen, *any* kind of jump into the pit might well have been considered by the jury to be inherently dangerous. "Jump" is a word of popular meaning and requires no learned excursion into semantics for clarification.

The jury might well have taken into consideration, too, that under the pressures of the job—the "speedup" pratices of the sawyer, the example of the other girls, and the twitting of the foreman—the appellee got down into the pit as quickly as she could, without observing or remembering her own technique in doing so.

In any event, there was ample evidence to go to the jury that the appellee did jump, and that any kind of a jump into that particular 36-inch pit was inherently dangerous.

Not only is there evidence from which the jury could have determined that jumping into the pit was inherently dangerous, but the record contains ample support for the conclusion that such jumping was an essential part of the appellee's job. Her foreman had instructed her to jump, and she had to get into the pit fast to keep up with the sawyer. That made jumping a part of her assigned task.

In Walters v. Dock Commission, 126 Or. 487, 496, 497, 245 P. 1117, 266 P. 634, 637, 270 P. 778, the court said:

"We shall briefly review the evidence, but, before doing so, let us remind ourselves of a principle of law applicable to the inquiry. We shall state this principle by using the words found in 4 Labatt's Master and Servant (2 Ed.), § 1566:

"'The scope of a servant's duties in relation to the rule illustrated by the cases cited in the last section is defined by what he was employed to perform, and by what, with the knowledge and approval of his employer, he actually did perform, rather than by the mere verbal designation of his position. The question whether the injured person was acting in the course of his employment is for the jury, where the evidence is conflicting, or where a difference of opinion may reasonably be entertained with regard to the proper inference to be drawn from the testimony. Otherwise that question is decided as one of law by the court.'

"'Any evidence which has a bearing upon the actual scope of the servant's duties is admissible. * * *'

"In 39 C.J., 'Master and Servant,' § 402, the rule is stated thus:

"'* * * But where the servant acts in obedience to an express order of the master, or performs work not strictly within the line of his duty at the command or request of another servant having either express or implied authority to make such

178

command or request, he is within the general scope of his employment. * * *'"

Cf. Union Oil Co. of California v. Hunt, 9 Cir., 111 F.2d 269, 275.

Finally, the reach of the Employers' Liability Act of Oregon is thus summarized by the Supreme Court of that State, in the case of Bottig v. Polsky, supra, 101 Or. at pages 548, 549, 201 P. at page 194:

"If the employment as a class is inherently dangerous, or if, because of the presence of certain conditions, an otherwise nondangerous employment is rendered inherently dangerous then the Employers' Liability Act applies, and it becomes the duty of the employer to use the care prescribed by the statute. The question as to whether or not a work involves a risk or danger is generally a question of fact to be decided by a jury * * *."

■ In the instant case, we hold that there was sufficient evidence to go to the jury both on the question of the danger inherent in her employment "as a class" and on the question of the danger inherent in the "conditions" surrounding the particular operation in which she was engaged at the moment of the accident; i. e., jumping into the pit. Accordingly, we think that, under the jurisprudence of the State of Oregon, the Employers' Liability Act is applicable to the instant case.

■ 2. We now reach the question of whether or not the appellee has made out a case sufficient to go to the jury as to the appellant's negligence, under the standards set down by the act.

Our holding in the earlier opinion on the subject of negligence may be regarded as "the law of the case," since the evidence on this point adduced at the two trials was virtually identical. We then held, and now hold, that there was sufficient evidence to go to the jury on the following points:

(a) That the appellant failed to "use every device" that it might have been "practicable to use" for the safety of its employees engaged in punking work. The jury might reasonably have reached the conclusion that the rolls should have been removed sooner, or that stairs or a ladder could have been installed, or other appropriate changes made.

(b) That the appellant failed to use "every * * * care and precaution" for its employees' safety, as required by the statute. The appellant's employee, Guy Smith, who was the foreman in charge of the appellee's work, instructed her to jump; and when, finding that jumping strained her leg she asked for other work or for some other means of getting into the pit, he "just laughed" at her.

See Smith v. Shevlin-Hixon Co., supra, 9 Cir., 157 F.2d 51, at pages 54–59.

■ Although, as we pointed out in the first case, 157 F.2d 51, at page 57, the appellant could not have excused itself by urging that it could not have foreseen that the appellee would suffer the particular mishap that overtook her, there is evidence here showing that the appellant did get a precise warning. We allude to the appellee's testimony that she complained to her foreman regarding the jump that eventually caused her injuries.

In Lillie v. Thompson, 1947, 68 S.Ct. 140, 142, the Supreme Court of the United States used language that we believe is apposite here:

"We are of the opinion that the allegations in the complaint, if supported by evidence, will warrant submission to a jury. Petitioner alleged in effect that respondent was aware of conditions which created a likelihood that a young woman performing the duties required of petitioner would suffer just such an injury as was in fact inflicted upon her."

The appellee's evidence in this case is even stronger than the evidence that the Supreme Court in the Lillie case, supra, declared would have been sufficient. Here, the appellant, through its night foreman, was not only made aware that any middle-aged woman "performing the duties required of" her would be injured by the jump, but received definite warning from the future victim herself that she considered the jump perilous!

We therefore hold that there was sufficient evidence to go to the jury on the question of the appellant's negligence in failing to meet the high standards of care set by the act.

Specifications of Error Nos. 3, 5 and 6 deal with asserted errors of the court in failing or refusing to give certain instructions. The transcript shows that the following colloquy occurred between the court and counsel for the appellant after the former had delivered its instructions:

"The Court— * * *

"Do you want me to add anything before the jury retires? You may take your exceptions later.

"Mr. Powers: No, I think your Honor has covered it, unless your Honor wants to speak about whether the injury actually came from this condition.

*     *     *     *     *     *

"Defendant's Exceptions to Court's Instructions

"Mr. Powers: May it please the Court, the only exception we would ask is with respect to Requested Instruction No. 5 and No. 14, having to do with aggravation. There was some testimony by their doctor to the effect that the plaintiff has traumatic arthritis, and they make no claim at all in the complaint of such condition, and we thought that should have been eliminated from the case.

"Then, Requested Instruction No. 8 which follows that Barker case, which we felt the Court should have given, in withdrawing from the jury's consideration the provision of the Act respecting machinery, because here the plaintiff was not injured by any machinery and does not claim to have been. Requested Instruction No. 6, which is to the effect that the employer is not required to have the most modern or the newest methods, under the Act. We wish to except to those requested instructions."

The foregoing are all the objections to the court's instructions that were urged in the court below by the appellant. They are, we think, insufficient to support the specifications of error that we are now considering. Those specifications read as follows:

"3. The trial court erred in failing to instruct the jury properly as to the law in regard to the Employers' Liability Act with reference to the facts which the jury must find in order for said act to apply."

"5. The trial court erred as a matter of law in failing to instruct the jury properly as to the measure of damages."

"6. The trial court erred in refusing to instruct the jury, as requested by appellant, that appellee could not recover for any injury or disability caused by traumatic arthritis, no claim having been made for traumatic arthritis."

Rule 51 of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, provides in part as follows:

"No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

See also Tucker v. Loew's Theatre & Realty Corporation, 2 Cir., 149 F.2d 677, 680 and cf. Frederick v. United States, 9 Cir., 163 F.2d 536, 549, certiorari denied, 1947, 332 U.S. ——, 68 S.Ct. 87.

Rule 20(d) of this court reads in part as follows:

"When the error alleged is to the charge of the court, the specification shall set out the part referred to totidem verbis, whether it be in instructions given or in instructions refused, together with the grounds of the objections urged at the trial."

As we test these three specifications in the light of the record made below, we find that Nos. 3 and 5 embody objections not "distinctly" urged in the trial court, nor were the grounds for such objections properly presented there, as required by Rule 51, F.R.C.P.

Furthermore, all three specifications completely disregard our Rule 20(d), in that none of them sets out "totidem verbis" the requested instruction that was refused. Nos. 3 and 5 utterly fail to state "the grounds of the objections urged at the trial".

For these reasons we decline to consider these three specifications. We may observe in passing, however, that our careful study of the record convinces us that they do not set up prejudicial error.

Specifications 7 and 8, which are argued together, follow:

"7. That there is no competent medical evidence sufficient to support the jury's verdict in favor of plaintiff, in that the only medical testimony as to the cause of the injury is based upon hypothetical situations, not connected with the facts shown by the evidence; it appears from the testimony of plaintiff's medical expert that he had no history, knowledge or information as to manner, distance or height plaintiff jumped, or whether she jumped from a sitting position.

"8. There is no competent medical evidence in this case sufficient to support the jury's verdict, in that plaintiff's medical testimony showed only possibility rather than probability of injury. The jury was required to speculate and conjecture as to which of two or more causes was responsible for plaintiff's alleged injury."

At the outset, it should be borne in mind that "there was no doctor in the house" when the accident occurred. Consequently, the physicians and surgeons who testified had to depend upon the appellee's version of what occurred, or upon hypothetical questions propounded by counsel.

For this reason, her testimony as to the circumstances of the accident is relevant here:

"I jumped from that platform on down to the floor. * * * I know I had an awful lot of pain when I hit the floor *  * * In my right knee * * * I stood there and cried; it hurt so bad I couldn't do much else."

In its brief, the appellant quotes at some length from the testimony on cross-examination of Dr. E. G. Chuinard, a specialist in orthopedics, who was called on behalf of the appellee. Had counsel continued their quotation for two additional questions and answers, some pertinent evidence would have come to light:

"Q. Arthritis, as such, is not something that just happens today. In your opinion, isn't it a fact that you feel that arthritis developing there, and it had developed for some little time before this accident, May 15, 1943? A. Before the accident?

"Q. Yes. A. Oh, I don't believe so. I think that is the result of injury."

Dr. Chuinard further testified as follows:

"Relying upon the patient's statement that she has had no other injury or accident and on the history of continuous trouble since that time, and putting the physical findings and the history and X-ray findings all together, it seems apparent that the patient has had a chronic disability in this knee resulting from this injury which she mentions.

"I do not believe this knee will ever be as good as it was before it was injured."

Dr. J. F. Hosch, called by the appellant, testified that when he examined the appellee before she went to work for the appellant, he did not "observe any lameness, or anything of the kind" or "any evidence of any previous accident that she had had."

Without further laboring the point, we may say that the lay testimony and the expert testimony taken together constituted sufficient evidence to go to the jury on the question of the nature and the cause of the appellee's injury.

We do not believe, however, that the appellee is correct in her statement that the present appeal "has been sued out merely for delay, and damages of 10% of the judgment herein in addition to the usual interest and regular judgment should be awarded appellee herein, pursuant to subdivision 2 of Rule 26 of the Rules of this Court". While we do not agree with the appellant's contentions, we think that the record in this case presents arguable propositions of law and of fact, so as to remove the present appeal from the reach of Rule 26.

As we study the law and the facts of this case, we bear in mind "that the Employers' Liability Act of Oregon is a remedial and preventive statute, and should be liberally construed." This was fully elaborated in our opinion in the first case, and need not be rehearsed here. 157 F.2d 51, at page 54.

In such a benign legal climate, an appellate court cannot use an apothecary's scale to determine the precise minimum of evidence that was necessary to support the jury's verdict. Nor should we scrutinize the judge's instructions with a microscope, to spy out technical peccadilloes.

Reading the record as a whole, we are satisfied that the court below committed no reversible error, and that substantial justice has been done.

Accordingly, the judgment is affirmed.