Argued September 10; reversed October 1, 1946; rehearing
denied March 25, 1947

# BARKER *v.* PORTLAND TRACTION CO.

(173 P. (2d) 288; 178 P. (2d) 706)

*John J. Coughlin,* of Portland (Griffith, Peck, Phillips & Nelson, of Portland, on brief), for appellant.

*Edwin D. Hicks,* of Portland (Green & Landye, Nels Peterson and Thomas H. Tongue, III, all of Portland, on brief), for respondent.

ROSSMAN, J.

This is an appeal by the defendant from a judgment in the amount of $9,000 which was entered in favor of the plaintiff after a jury had returned a verdict in his favor. The verdict and the judgment were based upon an injury which the plaintiff suffered December 6, 1942, and upon an averment that the injury was the result of negligence committed by the plaintiff's employer, the defendant.

The appellant presents eight assignments of error. The first is:

"The trial court erred in refusing to direct a verdict in favor of the appellant."

The second challenges the declination of the trial judge to instruct the jury:

"You will disregard plaintiff's claim that the defendant was negligent in failing to provide the plaintiff with a quantity of sand or ashes or some other substance or foot mat for the reason that this claim is not an issue for your consideration."

We shall term the parties with the same appellations that were used in the circuit court: plaintiff and defendant.

We shall now examine the evidence for the purpose of determining whether or not it indicates that the plaintiff possessed a cause of action against the defendant. Since the plaintiff argues that the defendant's duties toward him were governed by the "and generally" clause of our Employers' Liability Act (§§ 102-1601—102-1606, O. C. L. A.), we shall have that act in mind as we proceed. The "and generally" clause reads:

"*  *  *  and generally, all owners,  *  *  * and other persons having charge of, or responsible for, any work involving a risk or danger to the employees or the public, shall use every device, care and precaution which it is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material, or safety appliance and devices."

The defendant denies that that act is applicable to this case.

The defendant operates a streetcar line in Portland known as the Council Crest line which extends from Southwest Fifth Avenue and Washington Street to a place known as Council Crest. At the time of his injury the plaintiff was the operator of a one-man streetcar on the line. A section of the line's tracks which are in West Burnside Street is also used by the Twenty-third Street line.

December 6, 1942, the plaintiff had been in the defendant's employ for twenty-five years as a street-car operator. He had worked on the Council Crest line for twenty years and as the operator of one-man cars for several years. He sustained the injury upon which the judgment is based December 6, 1942, at 12:30 p. m., while he was freeing from snow an automatic switch at Twenty-second Place and Burnside Street. Passing automobiles had packed snow into the switch's groove until the switch could not function. He slipped while he was removing the snow and thus sustained his injury.

In the maintenance of its streetcar system, the defendant employs, in addition to the operators of cars, inspectors, dispatchers and various repair crews. The dispatchers see to it that a switchman or other employee takes care of a switch which is reported out of order. The defendant maintains at places along its lines telephones available to its streetcar operators which afford direct communication to the dispatchers.

The tracks at Twenty-second Place and Burnside Street are in the paved street. The switch at that point enables outbound Council Crest cars to turn to the left into Vista Avenue when they reach Twenty-second

Place, and Twenty-third Street cars to go straight ahead when they arrive at the same point. The switch operates automatically. When a Twenty-third Street car approaches it the car operator disengages his power and thereupon the switch moves into position so that the car can proceed straight ahead. When a Council Crest car nears the switch it maintains its power and the switch goes into position for the car to turn left into Vista Avenue. The part of the switch which causes the cars to go straight ahead or turn to the left was termed by the witnesses "the switch." It is nothing more than a triangular piece of steel four and one-half feet long, two inches wide at its broad end and pointed at the other. It is a part of the rails. Its thickness is the same as the flange of the car wheels, about two inches. It lies in a groove and its top is level with the rails.

Sunday, December 6, 1942, the plaintiff reported for work at 9:30 a. m., at the carbarn where his car was kept when it was not in use. It was his duty before taking the car from the barn to see to it that its four sandboxes were full and that the car possessed a broom and a switch iron. The plaintiff swore that when he left the barn and headed his car for Fifth and Washington Streets a few minutes after 9:30 his sandboxes were full and his car was equipped with a broom and a switch iron. By 11:30 he had completed two round trips over the Council Crest line and was back at Fifth and Washington Streets. Immediately before starting upon his third trip he was delayed an hour by a derailed car, but reached Burnside Street and Twenty-second Place at 12:30 p. m. Due to the fact that the derailed car had suspended service on the Council Crest line for almost an hour, the plaintiff had a standing load

when he reached Twenty-second Place, and five cars were behind his.

When the plaintiff left the carbarn Sunday morning "a light snow" was falling, so the plaintiff swore. Snow continued to fall until 2:30 p. m. and, according to the plaintiff, there was on the ground at that hour "anywhere from four to six inches of snow."

The plaintiff testified, "I didn't expect the amount of snow that did fall," and accordingly took with him no extra equipment when he left the carbarn. When he reached the switch in question at 12:30 he found that it was set for cars to go straight ahead and that snow in the groove prevented the automatic mechanism from functioning. He described the situation thus:

"The switch was packed with snow and ice, traffic had been going over it, and it was just all packed down and you couldn't see no railroad track * * *. I had to get out and dig that out."

He declared that the switch was not frozen.

When the plaintiff stepped from his car and went to the switch he took with him his broom and switch iron. The former was "just an ordinary broom, a little bit heavier than a house broom." He described the switch iron as "a piece of iron about three and one-half feet long, and it has got a handle on the end, and the end of it is flattened out kind of like a chisel; it is wider, and it is a piece of iron about that big just an iron rod with a handle on it and flattened out on the end." A switch iron, which the plaintiff said was "the kind of switch iron I was talking about," is one of the exhibits before us. It is made of a rod of steel a half inch in diameter. One end of the rod was hammered flat into the form of a cold chisel and the other was bent into

the form of an ellipsoid. The latter is the handle of the switch iron. The chisel part is two inches wide. The entire thing is three and one-half feet long. As a witness, the plaintiff found fault with switch irons as devices for removing snow and ice from switches. He said that they are blunt and that, therefore, they require the exertion of much pressure in the ejection of snow from switch grooves. It will be recalled that a groove is four and one-half feet long, two inches wide and two inches deep. The chisel end of a switch iron fits into the groove.

In the following testimony the plaintiff described what he did when he reached the switch:

"I got out and I had a broom and a switch iron, * * *. And I was digging away and trying to sweep the snow away and wasn't having much luck, and some little girl * * * came running over the sidewalk with a shovel, and between me and the little girl and the shovel and what I had I got it shoveled away and swept up and got it down so I could get through. And when I was running what we call the groove out, so I could pry it over with the switch iron, and I was running the groove out with the switching iron, the ice and stuff, so I could sweep it free, so I could pry it over, I slipped; * * *

"Q. What was it, if you know, that caused you to fall?

"A. Well, when I shoveled and scraped the soft snow off of the street it left an icy, slick formation on the pavement and that is what I slipped on."

In that way the plaintiff sustained the injury for which he recovered the attacked judgment. The accident occurred just before he had removed all of the snow from the clogged switch. A minute or two after he had slipped he brushed aside a little more snow and then the switch operated. Thereupon the plaintiff returned

to his car and continued on his way. To make matters clear, we add that the switch was not out of repair and it was not frozen.

The plaintiff had operated streetcars in other years during the fall of snow and, according to him, "once in a while you have to clear a switch."

The specifications of negligence, as averred in the complaint, follow:

"1. In failing to have said area in and around said switch covered with salt or some substance that would lower the freezing point so that said ice and snow would melt and thereby said switch would not become clogged.

"2. In failing to provide a safe place for plaintiff to work.

"3. In requiring plaintiff to perform unfamiliar, hazardous work outside the scope of his ordinary duties.

"4. In failing to furnish plaintiff proper or any equipment for cleaning the clogged snow and ice from the area immediately surrounding said switch.

"5. In failing to provide plaintiff with a quantity of sand or ashes, or some other substance, or a footmat that could have been placed upon said clogged snow and ice in the area of said switch, so that the same would not have been slippery.

"6. In requiring plaintiff to perform said work with unreasonable speed and dispatch.

"7. In failing to use every device, care and precaution practicable to be used and which would not have impaired the efficiency of the operation, in that defendant could have placed some substance which would lower the freezing point of said snow and ice so that said switch would not have become clogged, and could have provided a safe place for plaintiff to work, and could have had said switch cleared by other workmen whose regular duties

were such, and could have furnished plaintiff with a bar and heavy shovel, and could have furnished plaintiff with sand, ashes or other substance, or a foot mat so that the area around said switch would not have been slippery and hazardous, and could have allowed plaintiff adequate time to have performed said work in a careful and cautious manner."

The trial judge withdrew from the jury's consideration specifications of negligence Numbers 3 and 6 on the ground that no evidence was presented in support of either of them. The plaintiff makes no claim that the ruling was not warranted.

It will be observed that the remaining specifications of negligence charge that the defendant should have (1) spread salt "or some other substance" around the switch; (2) provided the plaintiff with a safe place for the performance of his work; (3) furnished the plaintiff with proper equipment for the removal of snow; (4) furnished the plaintiff with "sand, or ashes, or some other substance, or a foot mat"; and (5) used "every device, care and precaution practicable to be used" for the plaintiff's safety. By glancing again at the fifth specification, which is based upon the "and generally" clause of our Employers' Liability Act (§§ 102-1601 to 102-1606, O. C. L. A.) it will be observed that it avers that the defendant should have (a) spread salt over the switch area; (b) had some of its other workmen clean the switch; (4) "furnished plaintiff with a bar and heavy shovel"; and (d) furnished plaintiff with sand, ashes or some other substance or a foot mat.

The plaintiff swore that automobiles in passing over switches carry snow to them and pack it into the groove. Since the intersection of Twenty-second Place and

Burnside Street is upon the route which automobiles pursue in reaching The Heights and other places in the westerly part of Portland, "quite a bit of automobile traffic," so the plaintiff said, passes over the switch with which we are concerned.

At Twenty-second Place and Burnside Street the defendant maintains a telephone available to its operators which affords them direct connection with the dispatcher. Had the plaintiff wished to use that telephone when he came upon the obstructed switch he could have done so. He testified that whether an operator, upon encountering a disabled switch, telephones to the dispatcher or attends to the matter himself is a question for his own decision. We quote from his testimony:

"But if I have a load of passengers and they are nervous and in a hurry; they want to get where they are going, and rather than sit down and wait I always get out and do the best I can to keep the car moving.

"Q. But have there been occasions when you have sat and waited for crews to clear the switches?

"A. No, I didn't.

"Q. So that was a matter of the exercise of your own judgment, is that right?

"A. Yes, sir.

\* \* \*

"Q. You said in response to a question by Mr. Hicks that you had reported switches out of order in snowstorms, is that correct?

"A. Yes, I have reported them in snowstorms, and I have reported them otherwise too.

\* \* \*

"Q. You said that it was the duty of a switchman to remove the ice and snow from the groove, is that right?

"A. If it wasn't for the switches there would be no switchmen. It is the switchman's job to take care of the switches, yes, sir.

"Q. Did you call for a switchman at this particular time?

"A. No.

"Q. You had the right to call for a switchman, didn't you?

"A. I did.

\* \* \*

"Q. You had a right to call a switchman?

"A. I had a right, yes; but I was late and I had already performed the operation that the switchman would have if he had come, and I had the switch so I could go through it, and if I had tried to call the dispatcher I would just kill time and hold up my passengers, and probably get no result. And, on the other hand, if I had pulled up there and found that switch in the condition it was, if I called out the crew and waited for the switchman I might be sitting there yet."

The above was succeeded by more cross-examination, all of which was brought to a close by the trial judge's observation:

"Yes, he says cleaning the switch is a matter of exercising his own judgment."

The above are the circumstances under which the plaintiff left his car and went to the snow-clogged switch.

We now pass on to the charge that the defendant was negligent "in failing to provide plaintiff with a quantity of sand or ashes or some other substance or a foot mat." It should be observed that the plaintiff does not charge that the defendant itself should have spread sand, ashes or a mat upon the snow-covered surface of the street for the plaintiff to step upon when he began

to remove the snow from the switch. The complaint goes no further than to aver that the defendant should have provided the plaintiff with sand, ashes or a mat. Possibly the plaintiff concedes that the matter of determining whether sand, ashes or a mat should be placed upon the snow was for him to determine, although he claims that the defendant owed him a duty to provide those facilities.

We quote the following from the plaintiff's testimony:

"Q. I notice here in the complaint that you say that if you had had ashes that would have helped. How could ashes have helped you?

"A. Well, ashes would have been—served as a purpose to keep you from slipping. If there had been ashes put on the pavement after it was cleaned off, or even before it was cleaned off, you wouldn't have slipped on it.

"Q. You wouldn't have slipped with ashes?

"A. No.

"Q. Then you say that a foot mat,—what good would a foot mat have done out there?

"A. If you had something so that I wouldn't have slipped on that ice, if you had had anything to throw down there to stand on, you wouldn't have slipped; or even a blanket.

"Q. Would sand keep you from slipping?

"A. Yes, sand would."

The answer just quoted warrants a belief that the use of sand would have prevented the accident. The examination continued as follows:

"Q. Wouldn't sand have been as good as ashes?

"A. It might have been.

"Q. Well, you used sand on your steps when you have had snow, isn't that right?

"A.   Yes.

"Q.   Where did you get that sand?

"A.   I usually put the sand on at the end of the line, and get it out of the sandbox."

"At the end of the line", that is, at the Council Crest end of the line, the defendant maintains a supply of sand in a sandbox. It is available to all operators of Council Crest cars and is in addition to the stock kept in the carbarns.

The plaintiff testified that his car was equipped with four sandboxes and that each contained at the time of his injury seven gallons of sand. A box was over each of the car wheels and, according to him, each box "runs down to a point, goes out at a hose at the bottom." Through controls which are at the disposal of the operator, the sand can be released through the "hose at the bottom" of the sandbox to the rails. There is no cover over the sandboxes except a hinged seat available to passengers. The hinged seat can be readily raised so as to afford access to the sand. We again quote from the plaintiff's testimony:

"Q.   There would be nothing to prevent you from taking the sand out of the sandbox in the car, would there?

"A.   It is very difficult, when you have a load, to get your passengers to move, with your aisle full of passengers.

"Q.   It is difficult, but not impossible?

"A.   It isn't impossible but it is very difficult."

It will be remembered that at the moment when the plaintiff slipped and when, according to him, the accident could have been prevented had sand been at his disposal, each of his four sandboxes contained seven

gallons of sand. We resume our quotation from the plaintiff's testimony:

"Q. So you say in your complaint that there should have been ashes or sand or a mat, isn't that right?

"A. I didn't read the complaint.

"Q. Oh, you didn't? Well, who furnished the idea that you should have had sand on the pavement?

"A. I guess my lawyers did.

"Q. Who furnished the idea that you should have had ashes there?

"A. It all came from the same source.

"Q. What source is that?

"A. From my attorneys."

In making the above quotation, we imply no criticism whatever of the plaintiff's attorneys; they are valuable members of the legal profession. Our purpose is merely to show that when the plaintiff was engaged in clearing the switch no thought was in his mind that the use of sand was necessary. We revert to his testimony.

"Q. Well, you had a shovel available there, didn't you?

"A. Yes.

\* \* \*

"Q. I know; but your sand would have done the work there, wouldn't it? Would have kept the pavement from being slippery?

"A. Well, sand would have helped, yes.

"Q. If you had some there to keep the pavement from being slippery, your knee wouldn't have been bumped, isn't that so?

"A. If I hadn't fallen down my knee wouldn't have been hurt."

Thus again we have a statement from the plaintiff that sand upon the pavement would have prevented the injury; in fact, there is no dispute concerning that

matter, as appears from the following excerpt taken from the respondent's brief:

"Although if he had been furnished * * * with readily accessible materials to make it safe, such as sand, ashes or a mat, he would not have slipped."

We return to the testimony:

"Q. Well, now, as a matter of fact, you did have sand there. It might have been inconvenient to your passengers, but there was sand that you could have gotten in the shovel, and put it out on the pavement as you saw fit, isn't that right?

"A. It was just the next thing to impossible to get sand out of the sandbox, with the load I had packed in there.

"Q. Did you consider it essential as you got out of the car?

"A. No, I didn't consider it essential as I got out of the car, because I didn't know I was going to fall."

Thomas B. McCormick, who had been in the defendant's employ for thirty-six years as an operator, sixteen years of which were spent upon the Council Crest line, was the operator who relieved the plaintiff December 6 at 6:00 p. m., when the plaintiff had completed his day's work. He described the sandboxes used on Council Crest cars in terms similar to those employed by the plaintiff. Having done so, he gave the following testimony:

"Q. If you want to sand the rail, what are the mechanics for doing it?

"A. You mean the sand traps on the car?

"Q. Yes.

"A. Oh, they are inside.

"Q. How do you get to those?

"A. Just raise the seat up; or you can drop it down on the track.

"Q. You can drop sand down on the track?
"A. Yes.
"Q. That would be through the regular outlet?
"A. Yes.
"Q. And you could drop any quantity you want?
"A. You could dump it all out."

Although the plaintiff resumed the witness stand after McCormick had given the above-quoted testimony, he made no effort to challenge McCormick's statement that the contents of the sandboxes could have been readily released by the plaintiff to the pavement where it would have been available to him. Upon resuming the witness stand, the plaintiff left unmentioned the matter of sand. We are warranted in believing, therefore, that it was not necessary for the plaintiff to have gone inside his car and inserted his shovel into the sandboxes in order to get sand. An easier method was at hand—the one mentioned by McCormick.

So far we have not mentioned the tools and implements with which the plaintiff claims his car should have been equipped in snowy weather. He did not single out any specific tool, but he and witnesses called by him mentioned several which they declared were superior to switch irons as utensils for the removal of snow from switches. Some of them are chisels of assorted sizes, an ordinary pick, a rod bent in the form of a hook and having a sharp point, and a specially designed spoon. The plaintiff's witnesses dwelt at length upon pusher brooms, a "spud" broom, and several other kinds of brooms made of stout bristles. The plaintiff, in addition to mentioning vaguely some gadgets, swore that he should have been given a sand bucket and a foot mat.

As we said at the beginning of this opinion, the plaintiff claims that this case is governed by our Employers' Liability Act, §§ 102-1601 to 102-1606, O. C. L. A., particularly by the "and generally" clause which forms the final part of § 102-1601. The trial judge, in instructing the jury, declared that the case was governed by that clause.

■ By reverting to the language of the "and generally" clause, which is quoted in the fourth paragraph of this opinion, it will be seen that it governs employers who have charge of "any work involving a risk or danger." Although, as said in *Ferretti v. Southern Pacific Co.,* 154 Or. 97, 57 P. (2d) 1280, all work involves risk and danger, *O'Neill v. Odd Fellows Home,* 89 Or. 382, 174 P. 148, and *Bottig v. Polsky,* 101 Or. 530, 201 P. 188, after bestowing careful attention upon the ambit of the words just quoted, held that they apply only to employments which are inherently dangerous. The Ferretti decision reiterated that view and to it this court has adhered ever since the act was written. In *Union Oil Company of California v. Hunt,* 111 Fed. (2d) 269, the Circuit Court of Appeals for the Ninth Circuit embraced our interpretation of the "and generally" clause. The Bottig decision defines the term "inherently dangerous" and we need not repeat what is there said. Employers who are engaged in work involving risk and danger, that is, work which is inherently dangerous, are required by the clause to use "every device, care and precaution which it is practicable to use for the protection and safety of life and limb * * * without regard to the additional cost." The only limitation placed by the act upon that all-embracing requirement is "the necessity for preserving the efficiency of the structure, machine or other apparatus

or device." *Feretti v. Southern Pacific Co.*, supra, holds that when the evidence fails to show that the employment was inherently dangerous it is the court's duty to so rule.

We shall now consider whether or not the "and generally" clause taken by itself was applicable to the plaintiff's work of removing snow from the switch; that is, we shall disregard all other language of the act and all other duties performed by the plaintiff.

■ The removal of snow from the sidewalk in front of homes and stores by the occupants occurs every time snow falls. It is an operation of such a simple kind that householders and storekeepers entrust its performance to their children and to itinerant laborers. Seemingly they do not think of it as being attended with any noticeable risk or danger. There is, of course, the possibility that one's foot may slip, as did the plaintiff's, but such may also happen to anyone who ventures out of doors when snow is upon the ground. In fact, a servant who works indoors may slip upon a waxed floor. *Hoffman v. Broadway Hazelwood,* 139 Or. 519, 10 P. (2d) 349, 11 P. (2d) 814, 83 A. L. R. 1008, is one of the numerous instances in which an employee slipped upon an indoor floor which was not waxed. Snow is not a mysterious substance: its characteristics are reasonably well known to all. In its removal from small areas nothing is used except simple tools; that is, tools which present no concealed dangers and none which can not be readily appreciated. Nothing is used in its removal which creates dangers. The use of electricity, explosives or power-driven machinery in an employment may cause it to be classified as hazardous, but in the removal of small quantities of snow, forces and devices of that kind are not employed. At any rate, they were not used

in the instance before us. If we should hold that the removal of snow is inherently dangerous, then anyone who hires another to clear his walk of snow will be required to provide him with the extensive assortment of tools and brooms which the plaintiff and his witnesses described; in fact, he will be required to provide, in addition to the tools and brooms, a supply of sand and ashes, and even a foot mat. The very fact that such precautions are not taken is an indication that the removal of snow from small areas is not commonly deemed a dangerous undertaking. As we have said, no employment is afforded the protection of the Employers' Liability Act unless it presents dangers which are uncommon. Dangers of that kind may result from the use of electricity, machinery, explosives or dangerous substances; or they may be caused by unenclosed trap doors, defective scaffolding or unsuitable materials. It is our belief that the work of removing the snow from the clogged switch was not inherently dangerous.

■ The plaintiff's principal contention appears to be that if the general characteristics of an employment are hazardous, the "and generally" clause becomes applicable and requires the employer, as a supplementary duty, to exercise for the employee's safety "every device, care and precaution" even when he is performing work which does not subject him to "risk or danger." In advancing that contention, he claims that the general nature of his work as a streetcar operator was within the embrace of the parts of § 102-1601 which precede the "and generally" clause and deal with employments which expose employees to the hazards of machinery and electricity. After the plaintiff has made that contention he urges that if the general char-

acteristics of an employment are of the extra-hazardous type with which the act is concerned, an employee is entitled to redress even though his injury befell him when he was not exposed to the hazards of machinery or electricity and was doing nothing inherently dangerous.

The parts of § 102-1601 which deal with machinery and electricity are specific. The first requirement imposed by them upon an employer who operates machinery or uses electricity is that he "shall see that all metal, wood, rope, glass, rubber, gutta percha or other material whatever, shall be carefully selected and inspected and tested, so as to detect any defects." Having imposed that requirement, the act next deals with the building industry by delineating specifications which must be followed in the construction of scaffolding. The act then reverts to employers who operate machinery, and says: "All dangerous machinery shall be securely covered and protected * * * ." Shortly it speaks of power-driven machinery and requires that it be equipped with a signalling system so that the one who works upon a machine can communicate with the operator of the motive power. Those requirements are followed with others which are applicable to employers who have transmission lines. These provide that dead wires shall not be mingled with live wires; that the arms or supports bearing live wires shall be clearly designated and that wires carrying a dangerous voltage shall be so spaced that anyone working upon them will not be subjected to the danger of shock. Succinctly stated, those are the requirements imposed by the pertinent parts of § 102-1601 which precede the "and generally" clause. The plaintiff makes no contention that the defendant violated any of those provisions; in

fact, he concedes that he was not injured by machinery or electricity. Therefore, none of the foregoing requirements is applicable to his case.

Since none of the requirements just reviewed is applicable to the plaintiff's case, and since the "and generally" clause, which deals only with employments that are inherently dangerous, is likewise not applicable to his case, it would almost seem that this opinion could be concluded at this point. We have not, however, dealt directly with the argument that if the main features of an employment are extra-hazardous, due to the use of electricity and machinery, the "and generally" clause requires the employer to provide for the protection of the employee "every device, care and precaution", even while he is performing non-hazardous work. In the present case, the plaintiff insists that he is entitled to recover under the act, even though at the time of his injury he was not (a) in the vicinity of machinery, (b) exposed to the danger of electricity, or (c) doing anything which was inherently dangerous.

■ In support of the contentions just mentioned, the plaintiff cites *Fitzgerald v. Oregon-Washington R. & Nav. Co.*, 141 Or. 1, 16 P. (2d) 27. The workman in that case was a seal clerk who performed his duties in a freight yard. Much of his work was performed around freight and refrigerator cars. He was required to board the latter and to open and close their vents. Some of his work was performed in a two-story building in the yard. He was injured while he was in the unlighted hallway on the second floor of the building and was trying in the darkness to locate a cord which turned on a light. The cord was at the head of a staircase down which he fell while reaching for the cord. He averred that the defendant should have illumi-

nated the hallway and should not have so placed the cord that one, while reaching for it in the darkness, was likely to fall down the stairs. He alleged a violation of our lighting statute and based his case upon the Employers' Liability Act. The plaintiff quotes the following portions of the decision:

"It is not necessary for an employee to be actively engaged in his work in order to be within the protection of the statute. * * * To ascertain whether the statute applies to an employee in a given case, the character of service is determined by the contract of employment. * * * The question is not necessarily what was the employee doing at the very moment he was injured, but what the terms of his employment contemplate he would do when so directed."

It is also said in the decision:

"In the instant case, in order to warrant a recovery by reason of the provisions of the Employers' Liability Act, it is necessary not only that it be shown that defendant was engaged in the kind of work embraced within the terms of that statute, that the plaintiff was defendant's employee acting within the scope of his employment and that the terms of his employment contemplated the performance by plaintiff of work involving risk and danger; but also that the proximate cause of plaintiff's injury was one included within the terms of the statute."

The latter statement is significant in a consideration of the contentions presented by the plaintiff. We resume our quotation:

"The statute expressly mentions: 'Any defect in the structure, materials, works, plant or machinery of which the employer or his agent could have had knowledge by the exercise of ordinary care; the neglect of any person engaged as superin-

tendent, manager, foreman, or other person in charge or control of the works, plant, machinery or appliances; * * * .'

"The word 'works,' as used in the statute, means an entire plant—all the real estate, buildings and machinery used in the particular business: * * *

"As to the proximate cause in the instant case, the jury would have been warranted in finding that the defendant had not exercised ordinary care in reference to providing the means to light the stairway in question. * * *

"The height of the electric bulb above the head of the stairway in view of the length of the chain, or rather its shortness, may have been held to be a defect of which the employer could have had knowledge by the exercise of ordinary care.

"Our lighting statute expressly provides: 'All passageways and other portions of places of employment * * * shall be kept properly and sufficiently lighted during working hours,' and that 'the halls and stairs leading to the workrooms shall be properly and adequately lighted.' * * *

"Therefore, the jury would have been warranted in finding that the unlighted condition of the stairway resulted from the neglect of the superintendent, manager, foreman, or other person, in charge of the works.

"In the record there is evidence tending to prove that an order of the company was posted requiring employees using the stairway to extinguish the light when their use thereof was at an end; hence, the jury would have been justified in finding that the unlighted condition of the stairway was due to the act of a fellow-servant done in obedience to the rules, instructions and orders given by the employer, or by some person who had authority to direct the doing of said act."

It will be seen that the decision was not concerned with the "and generally" clause. The attacked judg-

ment was sustained on the ground that, through the defendant's failure to comply with requirements of the lighting statute, the defendant's ''works'' in which the plaintiff was required to perform his duties were rendered unsafe, in violation of the Employers' Liability Act. The decision does not hold that an employer must exercise for the safety of his employees while they are engaged in non-hazardous work the high degree of care exacted of him while they are performing hazardous duties.

The Employers' Liability Act, as this court has many times said, deals only with duties and employments which involve inherent risks and dangers. Duties and employments attended only with ordinary risks and dangers are unaffected by the act. Since the plaintiff was not injured while aboard his streetcar, we have no occasion for determining whether the operation of streetcars is within the protection of the Employers' Liability Act. We neither express nor intimate any impression upon that subject. The plaintiff was injured while removing snow from a small area of the public street, and, as we have indicated, work of that kind is not inherently dangerous.

■ We do not believe that the plaintiff's contention is warranted by any language of the Employers' Liability Act. Certainly no express provision of the act extends its protective features to employees engaged in the performance of non-hazardous work. According to our interpretation of the act, its protection is available only to (1) employments which are attended with inherent risks and dangers, and (2) employments which are rendered hazardous through the use of machinery, scaffolding, dangerous substances, electrical devices or other equipment and substances which are expressly

enumerated in the act. Any other construction of the act would not only import into it a provision which is not there, but would grant to a streetcar operator, who occasionally cleans a switch, the protective features of the act, and withhold them from the switchmen and greasers who daily work about the switches. Finally, as was pointed out expressly by Mr. Justice KELLY, in the language which we quoted from *Fitzgerald v. Oregon-Washington R. & Nav. Co.,* supra, it is necessary to a recovery that the proximate cause of a workman's injury be a violation by his employer of some provision of the statute.

It follows from what we have said that the plaintiff's work of removing snow from the switch was not within the protection of the Employers' Liability Act.

The question remains whether or not the evidence establishes prima facie a case under the common law principles of negligence. It will be recalled that the plaintiff conceded that his injury would not have happened if sand had been spread upon the snow-covered street, and that each of the four sandboxes of his car contained seven gallons of sand. His testimony indicates that a bucketful of sand would have sufficed for his purposes. We think that the evidence shows that the sand in the boxes was readily available to him. A gallon is equivalent to 231 cubic inches; therefore, seven gallons of sand can cover to a depth of one-quarter inch an area four feet wide and eleven feet long.

Since the plaintiff predicates his case, in part, upon an averment that the defendant should have provided him with some sand, and since a sufficient supply of sand was provided, it necessarily follows that the evidence does not establish a cause of action based upon common law negligence.

The motion for a directed verdict should have been sustained. Error was committed when it was overruled. The judgment of the circuit court is reversed and that court is instructed to enter a judgment for the defendant.

---

Petition for rehearing denied March 25, 1947

## ON PETITION FOR REHEARING
### (178 P. (2d) 706)

Before ROSSMAN, C. J., and LUSK, BELT, BAILEY and HAY, JJ.

ROSSMAN, C. J.

The brief filed by the respondent in support of his petition for a rehearing states two contentions. The first of these follows:

"The decision is contrary not only to the Fitzgerald case, but to the law as established by other decisions and of this and other courts to the clear effect that if the general characteristics of an employment involve risk and danger an employe is covered by Employers' Liability legislation regardless of whether his particular duties when injured are inherently dangerous."

The second is:

"The plaintiff in this case was clearly engaged in work involving risk or danger under the Employers' Liability Act at the time of his injury in the light of the above cases, both as the operator of a streetcar and also as to the particular work of clearing the switch, and at the least he is entitled to have this question submitted to a jury in a new trial."

The brief filed by the respondent in support of his petition for a rehearing, like his original brief, relies upon *Fitzgerald v. Oregon-Washington R. & N. Co.,* 141 Or. 1, 16 P. (2d) 27. A score or so of pages of the present brief cite the Fitzgerald decision. The following part of that decision is twice quoted:

"It is not necessary for an employee to be actively engaged in his work in order to be within the protection of the statute. * * * To ascertain whether the statute applies to an employee in a given case, the character of service is determined by the contract of employment. * * * The question is not necessarily what was the employee doing at the very moment he was injured, but what the terms of his employment contemplate he would do when so directed."

That part was quoted in our original opinion which also copied from the Fitzgerald opinion the following, which the respondent does not mention:

"In the instant case, in order to warrant a recovery by reason of the provisions of the Employers' Liability Act, it is necessary not only that it be shown that defendant was engaged in the kind of work embraced within the terms of that statute, that the plaintiff was defendant's employee acting within the scope of his employment, and that the terms of his employment contemplated the performance by plaintiff of work involving risk and danger; but also that the proximate cause of plaintiff's injury was one included within the terms of the statute."

By reverting to the excerpts of the Fitzgerald opinion upon which the respondent relies, it will be seen that no part of the excerpts support—at least not expressly—the respondent's contention that if the duties generally performed by an employe are pro-

tected by the Employers' Liability Act he is entitled to recover under the act for an injury which befell him while he was doing something which was not affected by the act. No part of the Fitzgerald decision says that an employe who sustained an injury while he was (1) not engaged in construction work; (2) not working around scaffolding, electricity, machinery, a floor opening or dangerous substances; or (3) not performing work which involved "risk or danger," may nevertheless recover under the act.

Our original opinion, referring to the Fitzgerald case, said:

> "The attacked judgment was sustained on the ground that, through the defendant's failure to comply with requirements of the lighting statute, the defendant's 'works' in which the plaintiff was required to perform his duties were rendered unsafe, in violation of the Employers' Liability Act."

The brief of the respondent, filed in support of his petition for a rehearing, says:

> "We respectfully submit that a reading of the Fitzgerald decision together with that of the Act makes it clear beyond doubt that the question of unsafe or defective 'works' had nothing whatever to do with the determination by this court in that case of the basic question of whether the employment of the plaintiff, either at the time of his injury or otherwise, involved risk or danger."

We have read again the Fitzgerald decision. In doing so we re-examined the briefs and the abstract of record filed in that case. The complaint which instituted the case consisted of five paragraphs. The first alleged the corporate character of the defendant; the second averred that the defendant maintained a

railroad yard in Portland; the third described the two-story building in which the plaintiff worked and the activities which were carried on in that structure by him and the other employes; the fourth, which.is the one that makes the charge of negligence, follows:

"That on or about the said 10th day of February, 1931, defendant carelessly and negligently failed and neglected to have the said passageway and stairway properly and sufficiently lighted during working hours, and carelessly and negligently failed and neglected to keep a proper and adequate light burning in the hallways near said stairs from the time said building was open until it was closed, and carelessly and negligently failed to furnish and supply said premises with switching and controlling devices and apparatus so that any lights could be turned on therein at the main points of entrance to said building and defendant carelessly and negligently ordered and directed its employees in and about said premises to keep the lights it did supply in connection therewith turned off except when in actual use, and to turn the same on only when actually in said premises, and defendant further carelessly and negligently furnished as the sole means of lighting the said passageway and stairway a certain electric light situated at a point immediately over the top of said stairway at the point where the same joined said passageway, and carelessly and negligently furnished as the only means of turning on said light a certain pull cord or chain, so situated that defendant's employees, including plaintiff, when turning on said light, were required to go in the darkness to a point at the top of said stairway and reach upward and find said chain or cord, in the darkness, while standing at a point immediately at the top of said stairway, and there was great and imminent danger by reason thereof, that employees, while searching for said light in the darkness, would be unable to locate the top of said stair-

way and would step off the same in the darkness, or lose their balance at the edge thereof, and fall down said stairway and be injured, all of which defendant then and there well knew.''

The fifth paragraph of the complaint averred that when the plaintiff reached for the cord for the purpose of turning on the light at the head of the stairs he fell down the staircase and sustained the injury for which he sought damages.

Without resorting to further analysis, we express a belief that the review of the Fitzgerald decision in our previous decision correctly states its holding.

The respondent's brief repeatedly urges that ''if the general characteristics of an employment involve risk and danger'' to an employe, he is entitled to recover under the act, even though at the time of his injury he was not doing anything involving ''the general characteristics'' of his employment. Many pages of the respondent's brief employ the term ''the general characteristics of the employment.'' One of them says:

''The following cases illustrate the application of the rule of the Fitzgerald case that the application of the Act does not depend upon what the employee is doing at the moment of his injury, but by the general characteristics of the employment in which he is engaged, as determined by his contract of employment, and upon whether, by this standard, it can be said that he was engaged in a hazardous employment or occupation involving inherent risk or danger; McKay v. Commission of Port of Toledo, 77 Or. 611 (plaintiff employed on dredge—injured while climbing ladder to hydrant); Rorvik v. North Pacific Lumber Co., 99 Or. 58 (captain of ship loading lumber injured while standing on dock by employee of lumber company delivering lumber). Bottig v. Polsky, 101 Or. 530 (plaintiff employed to load

barrels in railroad car, to be stocked in tiers—injured when barrel fell from another tier); Jodoin v. Luckenbach S. S. Co., Inc., 125 Or. 634 (plaintiff employed as longshoreman—injured while pushing hand truck along dock into jitney which had stopped in front of him); Freeman v. Wentworth & Irwin, Inc., 139 Or. 1 (plaintiff employed as auto mechanic —injured while pounding on shaft with hard metal hammer); Smith v. Shevlin-Hixon Co., 157 F. (2d) 51 (plaintiff employed in box factory—injured in jumping down 33-inch drop to place of employment).''

If the contention which we just quoted from the respondent's brief is correct and if, therefore, an employee, whose duties have ''the general characteristics'' of inherent risk and danger, is entitled to the benefit of the act for an injury which befell him while he was doing something unaffected by inherent risk or danger, then it is possible for two employees who were injured simultaneously by a negligent act of their employer to receive treatment by the courts entirely dissimilar. Let us assume a hypothetical case in which two employes of an electrical concern are injured in the company's warehouse by the falling of ceiling plaster. If one were a lineman who generally worked on the company's poles among power wires, the respondent's construction of the act would entitle him to the act's liberal provisions when he sued his employer for damages. Those provisions, which are several and important, include the one which exacts of employers subject to the act a very high degree of care. Other provisions which would be material in such an action deny to the employer the defenses of contributory negligence and of the fellow servant rule. In the event the employe died as a result of his injury, another provision of the act would enable his widow to maintain a damage ac-

tion in her own name and still another would authorize her to sue for an unlimited amount of damages. Now let us look at the situation of the other employe in our hypothetical case, and let us assume that he was a book-keeper who performed all of his duties in the ware-house. In an action by him to recover damages for the personal injury he incurred simultaneously with the other, and by the same tortious act, the respondent would not, we believe, contend that he would be entitled to the benefits of the Employers' Liability Act. This latter employe would, therefore, be relegated to reliance upon common law standards. All available defenses could be plead against his action. If he died as a result of his injuries, his widow could not maintain an action for damages. If his estate instituted an action, $10,000 would be the maximum amount recoverable.

Since courts never assume that legislation is intended to accomplish illogical results and divide people into favored and unfavored classes, the results which would follow from the respondent's construction of the act are worthy of mention. Hence, our delineation of the above situation.

If the respondent's contention is carried to a logical conclusion, it would be necessary for an employe who seeks the benefit of the Employers' Liability Act to prove, not only that he was injured by a defect in his employer's plant or equipment which should have been eliminated, but also that "the general characteristics of the employment in which he was engaged" subjected him to hazards against which the act was intended to afford protection. If he can prove nothing more than that his employer occasionally ordered him to enter the powerhouse, that being the scene of the hazard, his proof will not suffice, for he will have failed to show that "the general characteristics of his employment"

were attended with inherent danger and risk. No decision of this court has placed that construction upon the act.

*Clayton v. Enterprise Electric Co.*, 82 Or. 149, 161 P. 411, shows that it is not necessary that the general characteristics of an employment should be under the protection of the act. It held that a fatal injury, which befell an employe due to a hazard which would not have existed had the defendant complied with the Employers' Liability Act, authorized a recovery. In that case, the employe was not in the defendant's employ, but in the employ of one Carl Roe, who maintained a pumping station for the irrigation of his land. The station received electrical power from the defendant by a line which carried "a high and dangerous current, necessarily fatal to any human life subjected to it." A switch in the pumping station, by means of which the power was connected and disconnected, was "not suitable for such voltage as was carried over the wires in question." Further, the wires were not properly insulated. The deceased employe, according to the decision, "was entirely ignorant in relation to electricity. He had turned the current off and on only a few times prior to the occurrence causing his death." It seems evident from the decision that "the general characteristics" of his employment did not subject him to the dangers inherent in the defendant's facilities. Immediately prior to his fatal accident the deceased entered the pumping station for the purpose of shutting off the motor. Due to the defective switch and the improper insulation the deceased was electrocuted. The decision makes it manifest that it is not necessary that the general characteristics of an employment be hazardous, provided that the duty which the employe was performing was within the purview of the act, and provided

that the injury was due to a violation of the requirements of the act.

We have carefully examined the numerous authorities cited by the respondent, but do not believe that any of them authorize the construction which he urges us to place upon the Employers' Liability Act. We remain satisfied with the interpretation which our previous decision used, and are convinced that it is in harmony with the construction that this court has always employed.

All parts of the petition for a rehearing and its accompanying brief have received from us careful attention. The petition for a rehearing is denied.